**Walter J. BLAIR, Appellant,**

v.

**Bill ARMONTROUT, Appellee.**

**Walter J. BLAIR, Appellee,**

v.

**Bill ARMONTROUT, Appellant.**

Nos. 86–2375, 86–2376.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 14, 1987.

Decided Sept. 24, 1990.

---

Bernard J. Rhodes, Kansas City, Mo., for appellant.

Jay D. Haden, Kansas City, Mo., for appellee.

Before HEANEY * and FLOYD R. GIBSON, Senior Circuit Judges, and JOHN R. GIBSON, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

Walter J. Blair, convicted of capital murder and sentenced to death, appeals from the district court's[1] denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254 (1989). Blair was convicted of killing Kathy Jo Allen, who was scheduled to testify as the victim in the rape trial of Larry Jackson. Jackson had made offers to pay Blair to kill Allen. On this appeal from denial of the writ, Blair argues that the writ should be granted for the following reasons: (1) the State knowingly used perjured testimony at his trial; (2) the exclusion from pretrial interrogation of an attorney who had represented Blair on an unrelated charge rendered Blair's waiver of his *Miranda* rights ineffective; (3) the prosecutor's argument during Blair's sentencing violated his eighth amendment rights; (4) the jury in his trial was not given a first-degree murder instruction; and (5) he had not received effective assistance of counsel during this habeas corpus case. On cross-appeal, the State argues that the district court should not have disqualified all attorneys affiliated with the Office of the Attorney General of the State of Missouri. We affirm the district court's denial of Blair's petition and reverse its disqualification order.

Evidence at Blair's trial established the following facts in this case. While incarcerated with Blair in the Jackson County Jail, Larry Jackson, who had been charged with raping Kathy Jo Allen, offered Blair $2,000 to keep Allen from testifying against him. Later, after Blair had been released, Jackson contacted Blair, told him that he wanted Allen killed, and raised his

---

* The Honorable Gerald W. Heaney, an active Circuit Judge when this case was argued, assumed senior status on January 1, 1989.

1. The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri.

offer to $6,000, which Blair accepted. On August 17, 1979, three days before Allen was scheduled to testify against Jackson in the rape trial, Blair told a friend, Ernest Jones, that he was going to watch the "white girl [Allen]" that evening and that he might "take her out." The following day, Blair told Jones that he had seen the girl and her boyfriend in her apartment the previous evening and that if he had had a gun he could have killed them both. Later that day, between 8:00 p.m. and 9:00 p.m., Blair showed Jones a .32 caliber handgun, which Blair said he had stolen earlier that day. In the early morning hours of August 19, at Ernest Jones' residence, Blair met his girl friend, Sharon Jones, who is not related to Ernest Jones, and together they went to his mother's residence. There, Blair told Sharon Jones that he was "going to kill the white bitch" and that he would return before sunrise.

Blair then left his mother's home and walked to Allen's apartment. He hid across the street from the apartment and watched for suspicious activity. Seeing none, Blair approached the apartment, removed a screen window, and entered Allen's bedroom. At that time, Allen and her boyfriend, Robert Kienzle, were asleep on a mattress in the living room. Blair then covered the lower part of his face with a pillow case he found on Allen's couch. Blair sat and watched the couple until Kienzle awoke at approximately 6:00 a.m. Blair pointed his gun at Kienzle and warned him not to move. Allen, hearing the men talking, then woke up. Blair told the couple that he was just there to rob them and that he would not harm them. Blair saw Kienzle's diamond ring, which Kienzle had attempted to hide under a pillow, and took it along with Kienzle's watch and cash from Kienzle's wallet. Blair told Allen to get dressed so that she could drive him somewhere. Blair refused to take Kienzle's car keys and also refused Kienzle's offer to act as his driver. When Blair was leaving with Allen, he told Kienzle that she would be back within seven to ten minutes. As soon as Blair was gone, Kienzle called the police. Kienzle testified that Allen's abductor wore clothing similar to

Blair's clothing as described by Sharon Jones.

At about 6:30 a.m., Velma Moore, who lived on E. 34th Street, heard screams, two gunshots, another scream, and a third shot. At around 7:00 a.m., the police found Allen's body next to her abandoned Volkswagen in a vacant lot at 3406 Tracy Avenue, four blocks from the home of Blair's mother. Allen was found nude from the waist up, had sustained head injuries caused by being struck with a blunt object, and had been shot in the head, chest, and wrist.

Blair arrived, out of breath, at his mother's house at around 7:00 a.m. Sharon Jones was still at the house, and she saw Blair carrying a pillow case. From the pillow case, she saw Blair take a brown purse, a silver diamond ring, two watches, his gun, and his gloves. Later that day, Blair and Sharon Jones went to Ernest Jones' residence. There, Blair passed around a diamond ring, a man's watch, and Allen's driver's license. Blair told Ernest Jones that he had abducted Allen and that "he hit her with a brick and that she wouldn't fall so he shot her." (Tr. V 1484). Blair also said that Jackson's family would pay him when they saw Allen's driver's license. That evening Blair burned the brown purse, the pillow case, and a spent shell casing.

On the day after the murder, Blair and Ernest Jones attempted unsuccessfully to pawn Kienzle's diamond ring. They then gave the ring to Ernest's older brother, Frederick Jones, and he pawned it for $50. Frederick gave the money to Ernest, who in turn gave the money to Blair.

On August 21, Blair contacted the Jackson family and showed them Allen's driver's license. That same day Blair also talked to Larry Jackson by telephone. Jackson told Blair that he loved him like a brother for what he had done, and that Blair would get the $6,000 he had been promised. Later that day, the police found Frederick Jones' name on the pawn ticket for Kienzle's ring and they arrested him. Soon thereafter Ernest Jones was also arrested.

When Blair learned of the arrests, he instructed Ernest Jones' girl friend, Tina Jackson, to have Ernest call a phone number and ask for "Cody." When Tina Jackson was questioned by the police later that day, she gave them the number supplied by Blair. The police determined that the phone number was for an apartment rented by Larry Jackson's sister, Linda Robertson. The Police then went to that apartment, but Linda Robertson told them that Blair was not there, and they then drove to the home of Blair's mother. The police were admitted by Mrs. Blair and during their search they found a hooded sweatshirt similar to the one described by Kienzle as being worn by Allen's abductor. Subsequent analysis of the sweatshirt yielded paint chips consistent with the paint on the outside of Allen's apartment and cat hair consistent with Allen's cat.

On August 22, Ernest Jones, at the behest of the police, called the number Blair had given to Tina Jackson. After a man answered the phone to the code name "Cody," the police entered Linda Robertson's apartment and found Blair with several members of the Jackson family. The police searched the apartment and found a watch similar to Kienzle's near Blair and a .32 caliber pistol in a closet. Later analysis showed that the two expended bullets found in and near Allen's body, as well as the shell casing Blair had attempted to burn, had all been fired by this weapon.

Blair was arrested and was read his *Miranda* rights at least two times. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Soon thereafter, Blair confessed to abducting and killing Kathy Jo Allen. Blair first confessed orally, then signed a written confession, and finally gave a third confession on videotape. Blair contended in each of these confessions that although he had killed Allen, he had intended only to kidnap her to

keep her from testifying against Jackson and that he had accidently shot her when she tried to escape.

Blair was convicted of Allen's murder and sentenced to death. The conviction and death sentence were affirmed on direct appeal. *State v. Blair*, 638 S.W.2d 739 (Mo.1982) (en banc), *cert. denied*, 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030, *reh'g denied*, 459 U.S. 1229, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). After certiorari was denied, Blair commenced a post-conviction proceeding in state court under Missouri's Rule 27.26.[2] Relief was subsequently denied and that denial was affirmed by the Missouri Court of Appeals for the Western District. *Blair v. State*, 683 S.W.2d 269 (Mo.Ct.App.1984) (per curiam).[3]

Blair then brought this habeas corpus proceeding under 28 U.S.C. § 2254. He argued that the prosecution: (1) called Ernest Jones as a witness without disclosing that the State had made explicit or implied promises to Jones with respect to charges pending against him in exchange for his testimony; and (2) failed to correct Jones' false testimony concerning the existence of any "deals". Relying on *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), Blair contended that these two factors prejudiced the jury against him and gave Jones an incentive to alter his testimony, thereby rendering Blair's trial fundamentally unfair in violation of the due process clause of the fourteenth amendment.

The district court found that a prosecutor, James Bell, had discussed with Jones and his attorney, Peter Sterling, the possibility of a lenient disposition of Jones' case. Further, the court noted that Sterling told Jones that he would not go to the penitentiary if he testified in Blair's case. Moreover, the court noted that both Bell and Sterling testified that Jones had been informed of a possible plea bargain with the

---

**2.** Rule 27.26 was repealed effective January 1, 1988. Post-conviction relief in Missouri is now available under Missouri Supreme Court Rule 29.15.

**3.** In the post-conviction proceedings, the circuit court ruled on a number of issues. The court of

appeals issued a three-line order, but filed a supporting memorandum which dealt with Blair's arguments in detail. *See Blair v. State*, No. WD 35053, memorandum (Mo.Ct.App. July 31, 1984) (unpublished).

State in exchange for his testimony. The court, however, concluded that Jones had already been thoroughly impeached with evidence which indicated that in exchange for his testimony, he had not been charged with the capital murder of Allen, his pending probation had not been revoked, and he had received part of a $2500 award. Accordingly, the court concluded that any non-disclosure constituted harmless error, because it was not reasonably probable that, had this purported leniency agreement been disclosed, the outcome of Blair's trial would have been different. *Blair v. Armontrout*, 643 F.Supp. 785, 788 (W.D. Mo.1986).

In considering Blair's claim that he was prevented from seeing his attorney, the district court found that while Blair was in custody he had seen Kevin Locke, an assistant public defender, who had been assigned to defend Blair in an unrelated charge, in the hallway of the courthouse. When Blair saw Locke he said to one of the men holding him, "That's my attorney," and one of the prosecutors then took Locke into another office and told him that he could not speak with Blair. Nevertheless, the court held that Blair knowingly waived his *Miranda* rights because he knew at all times that he could refuse to speak with the authorities, that he could request an attorney, and that the State intended to use the videotaped confession to secure his conviction. *Id.* at 789.

The court rejected Blair's claim that the trial court erred by failing to instruct the jury on first-degree murder as a lesser-included offense of capital murder. It held that "the evidence presented at the trial would have been insufficient to support a conviction of first degree murder." *Id.* at 790. The court rejected Blair's argument that the conflict between these decisions violated his rights under the equal protection clause of the fourteenth amendment. *Id.*

Looking to Blair's *ex post facto* argument, the court held that his case involved a procedural as distinguished from a substantive change and hence the change did not violate the *ex post facto* clause. The court found that Blair had clear notice of the possible degrees of the offense under which he could be found guilty or not guilty. *Id.* at 791. Further, the court stated that a defendant could be convicted of capital murder both before and after the amendment to the statute of September 28, 1979. *Id.*

The court next considered Blair's claim that the prosecutor's closing argument in the sentencing phase of Blair's trial, in which the prosecutor argued that it would be more financially efficient to sentence Blair to death, violated his constitutional rights. The court rejected this argument without detailed discussion. *Id.* at 793–94.

On cross-appeal, the State argues that the district court erred when it disqualified all attorneys affiliated with the Attorney General's office because an attorney, prior to joining that office, had represented Blair in state post-conviction proceedings. *Blair v. Armontrout*, 626 F.Supp. 512, 517 (W.D. Mo.1985). The court concluded that "the scope of the disqualification properly extends to the Attorney General's office as a whole," *id.* at 516, and that the disqualification was also required to avoid the appearance of impropriety, *id.* at 516–17.

## I.

Blair first argues that the district court erred in employing the reasonable probability standard in determining that the State's knowing use of Ernest Jones' perjured testimony was harmless. In order to be entitled to habeas corpus relief on a claim that a conviction was premised on perjured testimony, a defendant must show that the prosecution knowingly used perjured testimony and that "the false testimony could have affected the judgment of the jury," *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976). *See also Johnson v. Trickey*, 882 F.2d 316, 318 (8th Cir.1989). We conclude that Blair fails to establish either of these requisite elements.

Jones testified on direct examination by the prosecutor that the prosecutor's office had told him that they would not press charges for accessory to murder if he told the truth about the case. His probation

officer told him his probation would not be revoked if he testified. He had received a $500 reward and expected to receive an additional $2,000 reward for his testimony. (Tr. V at 1495, 1497–98). Then, the testimony turned to pending cases (assault and drug possession) and Jones stated that the prosecutor had not made any deals with him on those cases.[4] Blair bases his claim that this testimony was perjured on later testimony given by the prosecutor, James Bell, in Jones' sentencing on the two charges pending at the time of his participation in Blair's trial,[5] and on statements made by Jones' attorney, Peter Sterling, during Blair's post-conviction hearing under Rule 27.26.[6]

When this argument was made in Blair's 27.26 hearing, the state circuit court noted that Blair's own evidence "revealed that no deal was made regarding Ernest Jones' pending cases." *Blair v. State*, No. CV83–6637, slip op. at 9 (Jackson Co.Cir.Ct. Div. 8 July 7, 1983) (unpublished). Accordingly,

the state circuit court concluded that Blair had "failed to establish the existence of any such deal, especially in light of the fact that the person who was supposed to gain the benefit of the deal, Jones, never knew of any such deal." *Id.* at 11. The Missouri Court of Appeals for the Western District agreed with this conclusion, stating that the "[m]ovant's contention that there existed an 'implied contract' as between the prosecution and the witness has no evidentiary basis." *Blair v. State*, No. WD 35053, memorandum at 3.

We review state court factual determinations in federal habeas corpus actions under 28 U.S.C. § 2254(d).[7] Federal courts must presume that state court factual determinations are correct unless the applicant can either establish the existence of one of seven conditions, § 2254(d)(1)–(7), or show that state court determinations are "not fairly supported by the record," § 2254(d)(8). *See Woods v. Armontrout*, 787 F.2d 310, 313 (8th Cir.1986), *cert. de-*

---

4. During Blair's trial, the prosecutor questioned Jones concerning the existence of any deals Jones might have made with the prosecution before testifying:

> Q. And even though you've received, or you're entitled to receive an additional $2,000 as reward money for your testimony, has anyone in the prosecutor's office offered to dismiss any of the three pending cases against you?
> A. No.
> Q. Have they made any deals with you on those three cases?
> A. No.

(Tr. V 1498).

5. The transcript of Bell's testimony in Jones' sentencing reads, in part, as follows:

> I had several discussions with Mr. Jones and his attorney prior to his testifying, telling him that I thought for tactical reasons it would be better not to discuss the specifics of a plea bargain in this case, but that I would make sure and recommend a lenient disposition of this case in exchange for his probation—or words to that effect—or in exchange for his cooperation. Words to that effect.
> He had already agreed to cooperate prior to that recommendation, but it is in consideration of this cooperation and the expense that would be incurred to house this defendant in an institution outside the State of Missouri that the State feels that probation is appropriate.

(Jones Sen. Tr. 4–5).

6. Sterling testified at Blair's Rule 27.26 hearing as follows:

> Q. (By Mr. Gardner) Did you feel you had an understanding with Mr. Bell that your client would not go to the penitentiary?
> A. Yes, I did.
> ....
> Q. Okay. And did you advise your client that he would not go to the penitentiary?
> A. Yes.
> Q. And you did feel that you had an agreement with Mr. Bell if your client testified in Walter Blair's case he would not go to the penitentiary?
> A. That is right.

(Rule 27.26 Hearing Tr. 68, 71–72).

7. The district court, in rather abbreviated fashion, outlined the evidence on this issue and concluded that "[b]oth counsel stated, under oath, that Jones had been informed of a possible plea bargain with the State for his testimony," *Blair v. Armontrout*, 643 F.Supp. at 787, but pointed to other impeaching testimony and the nature of Jones' testimony to show that the outcome would not have been different. *Id.* at 787–88. In reaching this conclusion, the district court made no reference to the limitations on its review imposed by 28 U.S.C. § 2254 and failed to consider any of the state court determinations on this issue. Instead, the court simply conducted an analysis under *Bagley*, 473 U.S. 667, 105 S.Ct. 3375, and found that any error that had occurred was harmless. In light of our holding, we do not reach these questions.

**1318**

*nied,* 479 U.S. 1036, 107 S.Ct. 890, 93 L.Ed.2d 842 (1987). If the applicant is unable to establish either alternative, "the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous." 28 U.S.C. § 2254(d); *see Sumner v. Mata,* 449 U.S. 539, 550, 101 S.Ct. 764, 770, 66 L.Ed.2d 722 (1981) (*Sumner I*). This "standard of review clearly places a heavy burden on the appellant." *Robinson v. Wyrick,* 735 F.2d 1091, 1093 (8th Cir.), *cert. denied,* 469 U.S. 983, 105 S.Ct. 390, 83 L.Ed.2d 324 (1984).

This standard applies in every habeas case "in which a state court of competent jurisdiction has made 'a determination after a hearing on the merits of a factual issue.'" *Sumner I,* 449 U.S. at 546, 101 S.Ct. at 768 (quoting 28 U.S.C. § 2254(d)). The only other requirements are "that the habeas applicant and the State or its agent be parties to the State proceeding," *id.,* and that the state court ruling is "evidenced by 'a written finding, written opinion, or other reliable and adequate written indicia,'" *id.* at 546–47, 101 S.Ct. at 769 (quoting 28 U.S.C. § 2254(d)). Congress enacted subsection (d) in 1966 to alleviate friction between the state and federal court systems. *Id.* at 550, 101 S.Ct. at 770. "This interest in federalism ... requires deference by federal courts to factual determinations of all state courts. This is true particularly ... where a federal court makes its determination based on the identical record that was considered by the state appellate court...." *Id.* at 547, 101 S.Ct. at 769. *See Townsend v. Sain,* 372 U.S. 293, 318, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963). We now consider Blair's arguments on this issue.

■ Blair first contends that section 2254(d) is inapplicable in this case because the question presented, whether the state

knowingly used perjured testimony, is a mixed question of law and fact.

It is well-established that section 2254(d) applies only to factual determinations and not to legal rulings or mixed questions of law and fact. *See Sumner v. Mata,* 455 U.S. 591, 597–98, 102 S.Ct. 1303, 1306–07, 71 L.Ed.2d 480 (1982) (per curiam) (*Sumner II*). Mixed questions involve "the application of legal principles to the historical facts of [a] case," *Cuyler v. Sullivan,* 446 U.S. 335, 342, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980), while factual determinations, "termed basic, primary, or historical," *Townsend,* 372 U.S. at 309 n. 6, 83 S.Ct. at 755 n. 6, are more similar to "a recital of external events and the credibility of their narrators," *id.* (quoting *Brown v. Allen,* 344 U.S. 443, 506, 73 S.Ct. 437, 445, 97 L.Ed. 469 (1953) (Frankfurter, J.)).

The state courts considering Blair's argument on this point determined a deal did not exist, which we believe is a factual determination. *See Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985);[8] *cf. Nix v. Whiteside,* 475 U.S. 157, 182, 106 S.Ct. 988, 1002, 89 L.Ed.2d 123 (1986) (Blackmun, J., joined by Brennan, Marshall, and Stevens, JJ., concurring) ("factual finding by the state court [that the defendant's testimony would have been perjurious] is entitled to a presumption of correctness under 28 U.S.C. § 2254(d)").

This question was squarely before the state circuit court in Blair's 27.26 proceeding. There, Blair's attorney argued vigorously that a deal had indeed existed. The court reviewed Jones' testimony, considered the prosecutor's statement at Jones' sentencing, and heard testimony from Jones' attorney. At the close of the arguments, the judge reviewed the record before him and wrote that:

> [Blair's] own evidence at the hearing held on June 20, 1983 revealed that no

**8.** In *Miller,* the Court noted that:

[O]ther considerations often suggest the appropriateness of resolving close questions concerning the status of an issue as one of "law" or "fact" in favor of extending deference to the trial court. *When, for example, the issue involves the credibility of witnesses and*

*therefore turns largely on an evaluation of demeanor, there are compelling and familiar justifications for leaving the process of applying law to fact to the trial court and according its determinations presumptive weight.*
474 U.S. at 114, 106 S.Ct. at 452 (emphasis added).

deal was made regarding Ernest Jones' pending cases.

. . . .

... The evidence of movant's trial and at movant's evidentiary hering [sic] is that Jones and Mr. Bell [the prosecutor] had not reached an agreement on Jones' pending cases.

*Blair v. State*, No. CV83–6637, slip op. at 9. Moreover, the Missouri Court of Appeals for the Western District specifically found that "[t]here exists no factual or evidentiary basis to reveal any agreement or 'deal'." *Blair v. State*, No. WD 35053, memorandum at 5. Accordingly, under 28 U.S.C. § 2254(d), we must presume that these determinations are correct.

■ Blair also argues, however, that these determinations are not "fairly supported by the record," citing 28 U.S.C. § 2254(d)(8), and hence should not be presumed correct.

The record before the state circuit court shows that the prosecutor, Bell, stated that he had several conversations with Jones and Sterling during which he had encouraged Jones to cooperate with the prosecution in its case against Blair. Bell told Sterling that in exchange for Jones' cooperation he would recommend a lenient disposition of the charges pending against Jones, and that "for tactical reasons it would be better not to discuss the specifics in this case." (Jones' Sentencing Tr. 4–5).

Sterling testified that he felt he had an agreement that Jones would not be sent to the penitentiary and that he had conveyed this feeling to Jones. When asked whether an agreement existed between his client and the prosecutor's office, however, Sterling described his relationship with prosecutor Bell as a working relationship, and stated that any agreement in existence at that time was unspoken. (Rule 27.26 Hearing Tr. 68–69). Sterling testified that he told Jones that he trusted Bell and that he believed that Bell would treat Jones favorably at the conclusion of the Blair case. (Rule 27.26 Hearing Tr. 68). Sterling also stated that he told Jones that because Jones "was testifying against a man who had to be presumed to be dangerous, that it was standard practice that he would not go to the penitentiary under those kinds of circumstances, assuming he testified and cooperated with Mr. Bell." (Rule 27.26 Hearing Tr. 68). Sterling further testified, however, that a specific plea agreement did not exist with Bell until after Blair's trial. He stated that Bell did not tell him that Jones would not go to some penitentiary other than the Missouri penitentiary. Finally, Sterling testified that it was not until just before Jones' sentencing that the specifics of a deal were outlined and that discussions on the plea continued in the courtroom. Sterling admitted that any understanding or agreement that he thought existed prior to this time was based on his individual opinion or feeling for the case and not on any specific promise made by Bell. (Rule 27.26 Hearing Tr. 81–84).

Based on the testimony of Bell and Sterling, the state circuit court found that no agreement existed.[9] In addition to the gen-

---

**9.** The state circuit court stated that:

The movant's own evidence at the hearing held on June 20, 1983 revealed that no deal was made regarding Ernest Jones' pending cases.

Mr. Peter Sterling, Mr. Jones' attorney at the time of movant's trial stated Mr. Bell would not enter into any specifics concerning Jones' pending cass [sic]. Mr. Sterling testified that he did not believe until one or two days before the date of Jone's [sic] plea, November 24, 1980, that he had a plea agreement as to the specific number of years of imprisonment to be imposed upon and of probation to be served by Jones. Mr. Sterling also testified that Mr. Bell did not say anything about Jones not having to go to the penitentiary. Mr. Sterling believed he had an agreement with Mr. Bell, but that was based only upon his unilateral speculative expectation of what Mr. Bell would do, not upon what Mr. Bell spoke of in unequivocal terms.

You cannot base a motion to vacate sentence and judgment upon the basis of one attorney's "belief" that there was an agreement *when in fact no agreement was ever reached prior to one or two days before Jones' guilty plea*, some 47 days after the testimony of Jones in movant's trial. *The evidence at the movant's trial and at the movant's evidentiary hering [sic] is that Jones and Mr. Bell had not reached an agreement on Jones' pending cases.*

eral statement containing its conclusions, the state circuit court made the following detailed findings of fact:

14. That the prosecutor, James Bell, stated prior to trial on September 29, 1980 that no agreement had been "expressly or impliedly" made with Jones regarding those pending charges and his testimony.

15. Mr. Peter Sterling, attorney for Ernest Jones, testified on June 20, 1983 that in conversations with Mr. James Bell about Mr. Jones' testimony prior to movant's trial, Mr. Bell told Mr. Sterling that he did not want to enter into any specifics concerning a deal with Mr. Jones on his then pending charges.

16. Mr. Peter Sterling testified on June 20, 1983 that prior to movant's trial, Mr. Bell never told him that Jones would not go to the penitentiary, but that Mr. Bell did say that there would be no problems in working out Jone's [sic] pending charges and that they would be taken care of.

17. Mr. Peter Sterling further testified that he did not believe until one or two days before the date of Mr. Jones' guilty plea on November 4, 1980, that he had a plea agreement as to the specific number of years of imprisonment to be imposed upon and of probation to be served by his client Ernest Jones.

*State v. Blair,* No. CV83–6637, slip op. at 2–3 (citation omitted).

In its review of Blair's 27.26 hearing, the Missouri Court of Appeals for the Western District also concluded that no specific agreement existed.[10]

*State v. Blair,* No. CV83–6637, slip op. at 9 (emphasis added).

**10.** The Missouri Court of Appeals stated in its unpublished *memorandum that:*

(1) The particular facts upon the record in support of the finding [that no deal existed] are as follows:
(a) the testimony of the witness [Jones] that he was not aware of any plea agreement,
(b) testimony of counsel for witness—that while the prosecutor advised counsel there would be no problems working out the witness's pending charge, the prosecutor declined entering into any specific agreement,

When the record before the state courts is considered in detail, it is apparent that there was no specific agreement concerning Jones' plea when Jones testified at Blair's trial.

Since Blair has failed to refute by convincing evidence the state courts' determinations that no deal existed between Jones and the prosecutor's office during Blair's trial, and because these determinations are fairly supported by the record, we presume under section 2254(d) that the state courts' findings that no deal existed are correct. Therefore, Jones did not perjure himself at Blair's trial when he testified that he had made no deals with the prosecutor's office. Accordingly, Blair has failed to establish that a knowing use of perjured testimony affected the judgment of the jury in his case.

■ Alternatively, Blair asks for an evidentiary hearing concerning the truthfulness of Jones' testimony. It is clear that the record before us is complete. This fact differentiates this case from *Johnson v. Trickey,* 882 F.2d 316, where we remanded a case for an evidentiary hearing to resolve the defendant's claim that perjured testimony was knowingly used by the prosecution. *Id.* at 319. We conclude that remand is unnecessary, because the record before us thoroughly supports the state courts' careful and detailed consideration of Jones' testimony.

## II.

■ Blair argues that the district court erred by ruling, without an evidentiary hearing, that Blair's waiver of his *Miranda*

(c) details as to a plea agreement were not discussed until a few days prior to the witness's guilty plea, which was a *month* subsequent to movant's trial,
(d) the evidence only supports a conclusion that the witness would be in a good position to enter into a plea agreement, not that such an agreement was in fact reached, and
(e) during movant's trial, counsel for the witness, just prior to the witness's giving his testimony, advised the trial court that pending charges against the witness had not been disposed of.
*Blair v. State,* No. WD 35053, memorandum at 2–3 (emphasis in original).

rights was effective even though his attorney was excluded from pretrial custodial interrogation. To support this claim, Blair particularly relies on statements in *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), indicating that its result would have been different if the defendant in that case had known of the public defender's efforts to contact him. He also relies upon *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). Blair argues that, at a minimum, the district court should have conducted an evidentiary hearing to decide whether Blair validly waived his *Miranda* rights.

The incident involving attorney Kevin Locke, an assistant public defender who was representing Blair on an unrelated charge, occurred after Blair had made two detailed oral confessions, one of which was transcribed and signed, and immediately before he was to be interrogated before a video camera. The incident with Locke thus cannot affect the two earlier confessions; the second confession was read, in its entirety, to the jury. It is also true, although neither Locke nor Blair knew it then, that Locke could not have represented Blair in this capital murder charge, as the defender's office had been appointed to represent Larry Jackson, the man who had extended the offer to Blair to kill Kathy Jo Allen.

The Supreme Court of Missouri, in Blair's direct appeal, made a detailed recitation of the facts concerning this incident. *State v. Blair*, 638 S.W.2d at 755. After Blair had given a written statement, he was asked if he would make a confession on video tape and was told that he could have an attorney present if he desired. "Appellant agreed to make a videotaped statement and repeatedly stated that he did not want an attorney." *Id.* at 749. The Missouri Supreme Court stated:

> As appellant was being transported by officers to the grand jury room where the videotaping would take place, they encountered Kevin Locke, an assistant public defender who represented appellant on an unrelated charge. As appellant passed, Locke greeted him and appellant made an unknown reply, where-

upon appellant and the accompanying officers continued on. Locke then demanded to speak with appellant and was refused. Mr. Locke did not represent appellant on the murder charge. At the beginning of his videotaped statement, appellant was again advised of his *Miranda* rights and again waived them. Appellant then made his third confession to the murder of Kathy Jo Allen.

*Id.* After pointing to the repeated *Miranda* warnings and its conclusion that the confessions were voluntary, the court further stated:

> Nor does the fact that Kevin Locke requested to speak with appellant dictate another result. Although Locke represented appellant on an unrelated charge, appellant made no request for any attorney and in fact repeatedly stated that he did not want an attorney. The trial court did not err in overruling appellant's motion to suppress his confessions.

*Id.*

Consistent with the factual findings made by the Missouri Supreme Court, the district court stated that "Blair knew at all times that he could refuse to speak and request a lawyer, and that he was aware of the State's intention to use the videotaped confession to secure a conviction." *Blair v. Armontrout*, 643 F.Supp. at 789.

We observe that "state-court findings [regarding subsidiary facts surrounding interrogations] ... are conclusive on the habeas court if fairly supported in the record and if the other circumstances enumerated in § 2254(d) are inapplicable." *Miller v. Fenton*, 474 U.S. at 117, 106 S.Ct. at 453. Accordingly, since we believe that the factual findings of the Missouri Supreme Court are fairly supported in the record, these findings are binding upon us. The district court conducting the habeas hearings concluded that, given these facts, Blair's waiver of his *Miranda* rights was valid, and that his confessions were voluntary. *Blair v. Armontrout*, 643 F.Supp. at 789. We agree with that conclusion.

We do not read *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410, as

aiding Blair's claim. In *Moran,* the defendant's sister had contacted a local public defender, who telephoned the police station and informed a detective that she would represent the defendant. Although the detective told the attorney that her client would not be questioned that night, not only was he questioned but he confessed to murder. The defendant in *Moran* did not know when he was questioned that the public defender had called for him. The Supreme Court held the confession admissible and stated that "deliberate deception of an attorney could not possibly affect a suspect's decision to waive [his] *Miranda* rights unless [the defendant] [was] at least aware of the incident." *Id.* at 423, 106 S.Ct. at 1142.

The situation before us is different from that in *Moran.* Locke did not represent Blair on the charge in question and could not have done so, because the public defender's office already represented Jackson. More significantly, Blair had already given two detailed confessions before he saw Locke. Finally, both before and after this incident occurred, Blair stated repeatedly that he did not want to see an attorney.

*Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, does not support Blair's position. In *Escobedo,* the Supreme Court held that a confession should have been excluded when police told a suspect that his attorney did not want to see him. *Id.* at 484, 84 S.Ct. at 1761. This case is unlike *Escobedo,* because nothing in the record indicates that the police ever misled Blair concerning either his right to counsel or his right against self-incrimination. Moreover, we note that the Court in *Moran* stated that " 'the "prime purpose" of *Escobedo* was not to vindicate the constitutional right to counsel as such, but, like *Miranda,* "to guarantee full effectuation of the privilege against self-incrimination." ' " *Moran,* 475 U.S. at 429–30, 106 S.Ct. at 1145, (quoting *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (Stewart, J.) (quoting *Johnson v. New Jersey,* 384 U.S. 719, 729, 86 S.Ct. 1772, 1778, 16 L.Ed.2d 882 (1966))).

 Blair argues that the State's conduct rendered his waiver of the *Miranda* rights invalid because he believed that the assertion of those rights would be futile. There is no support in the record for this position. Furthermore, we are not impressed with Blair's argument that the record is silent in many respects which are material to this issue. The record concerning this issue was fully developed at both Blair's suppression hearing and at his trial.

Since this issue was developed fully in a suppression hearing before trial and was aired in some detail before the jury during the trial, we reject Blair's claim that the district court erred by ruling, without an evidentiary hearing, that Locke's exclusion did not render Blair's waiver of his *Miranda* rights ineffective.

### III.

██ Blair argues that the prosecutor's plea for death during the sentencing portion of Blair's trial violated his eighth amendment rights. Blair points specifically to the following passage from the prosecution's closing argument:

> [T]here are only two penalties in this case, death or life without consideration of parole for 50 years.
>
> Why should we as taxpayers have to house this man for fifty years? Why should we have to feed him three meals a day for fifty years, clothe him for fifty years, furnish him recreation, medical care?

(Tr. VII 2317).

The district court recognized Blair's argument that recent polls had shown that cost was one reason for public support of the death penalty, but concluded that the argument did not violate his constitutional rights. *Blair v. Armontrout,* 643 F.Supp. at 793–94.

Blair argues, citing *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), that the sentencing portion of the trial did not meet the standard of reliability that the eighth amendment requires unless it can be said that the prosecutor's argument "had no effect on the

sentencing decision." *Id.* at 341, 105 S.Ct. at 2646. He points out that such arguments have been held indefensible, particularly by the Eleventh Circuit. *See Tucker v. Kemp,* 762 F.2d 1480 (11th Cir.) (en banc), *cert. granted and judgment vacated by* 474 U.S. 1001, 106 S.Ct. 517, 88 L.Ed.2d 452 (1985), *on remand,* 802 F.2d 1293 (11th Cir.1986) (en banc) (per curiam), *cert. denied,* 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987); *Brooks v. Kemp,* 762 F.2d 1383 (11th Cir.1985) (en banc), *cert. granted and judgment vacated by* 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), *on remand,* 809 F.2d 700 (11th Cir.1987) (en banc) (per curiam), *cert. denied,* 483 U.S. 1010, 107 S.Ct. 3240, 97 L.Ed.2d 744 (1987).

In *Brooks,* the Eleventh Circuit noted that it was clearly improper for the prosecutor "to argue that death should be imposed because it was cheaper than life imprisonment." 762 F.2d at 1412. Similarly, in *Tucker,* the Eleventh Circuit admonished the prosecutor for making an economic efficiency argument to support a death sentence. 762 F.2d at 1488 (calling the reference unprofessional and improper). In both cases, however, the court concluded that the arguments did not have enough adverse impact to render the sentencing proceedings under review fundamentally unfair. *See Tucker,* 762 F.2d at 1488; *Brooks,* 762 F.2d at 1416.[11]

We have no hesitation in condemning this argument.[12] There is simply no legal or ethical justification for imposing the death penalty on this basis and it is not a proper factor to be considered by the jury, for it does not reflect the properly considered circumstances of the crime or character of the individual. *See Zant v. Stephens,* 462 U.S. 862, 878–79, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235 (1983). The question remains, however, whether Blair has presented sufficient grounds for granting a writ.

The danger of a jury being swayed by prosecutorial misbehavior in closing arguments in the sentencing phase, especially in a capital murder case, is obvious. However, "[i]t is axiomatic that federal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension." *Wainwright v. Goode,* 464 U.S. 78, 83, 104 S.Ct. 378, 381, 78 L.Ed.2d 187 (1983) (per curiam); *see Wycoff v. Nix,* 869 F.2d 1111, 1113 (8th Cir.) (quoting *Goode*), *cert. denied,* —— U.S. ——, 110 S.Ct. 179, 107 L.Ed.2d 135 (1989). "In a § 2254 habeas corpus proceeding, a federal court's review of alleged due process violations stemming from a state court conviction is narrow." *Hamilton v. Nix,* 809 F.2d 463, 470 (8th Cir.) (en banc), *cert. denied,* 483 U.S. 1023, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987).

■ Blair's trial was bifurcated. Thus the prosecution's argument in the sentencing phase, which came after the jury had already found Blair guilty of capital murder, could not have affected the determination of guilt. We will only consider whether or not Blair was denied his due process rights during the sentencing phase by the prosecutor's comments.

In a recent Supreme Court case involving an argument more vicious than that before us today, *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), the prosecutor repeatedly referred to that defendant as an animal and wished that the defendant had been shot and had his "face" blown away. *Id.* at 183 n. 14, 106 S.Ct. at 2472 n. 14. The Supreme Court rejected the defendant's argument that the eighth amendment standard in *Caldwell,* 472 U.S. 320, 105 S.Ct. 2633, applied and instead evaluated the argument under the due process standard. *Id.* In distinguishing *Caldwell,* the Supreme Court observed that the comments there were made at the guilt-innocence stage rather than the sentencing stage, but went on to say that *Caldwell:*

---

11. The Eleventh Circuit's opinion in *Brooks,* 762 F.2d 1383, was reinstated by the court in *Brooks,* 809 F.2d at 701.

12. As the Eleventh Circuit observed in *Brooks,* 762 F.2d at 1442 n. 13, arguments such as this

have been condemned and have brought about reversal in state courts. *See, e.g., State v. Jordan,* 80 Ariz. 193, 195, 294 P.2d 677, 679 (1956); *Commonwealth v. Clark,* 322 Pa. 321, 185 A. 764, 766 (1936).

is relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision. In this case, none of the comments could have had the effect of misleading the jury into thinking that it had a reduced role in the sentencing process.

*Darden,* 477 U.S. at 183–84 n. 15, 106 S.Ct. at 2473 n. 15. *Darden* deals with an argument that is similar in nature to that before us and one that we believe to be stronger and more improper than the one in this case. As *Darden* applied the due process standard, we are satisfied that we are compelled to do so.[13] *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), applying an eighth amendment analysis to evidence of a victim impact statement, and *South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), dealing with a prolonged argument based on the victim, are not to the contrary.[14]

■ We recently defined this due process standard in *Newlon v. Armontrout,* 885 F.2d 1328 (8th Cir.1989), *cert. denied sub nom.* —— U.S. ——, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990), where we stated that:

> The petitioner must show that the alleged improprieties were "so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair." *Moore v. Wyrick,* 760 F.2d 884, 886 (8th Cir.1985). Under this standard, a petitioner must show that there is a "reasonable probability that the error complained of affected the outcome of the trial—i.e., that absent the alleged impropriety, the verdict probably would have been different." *Hamilton [v. Nix],* 809 F.2d at 470.

*Id.* at 1336–37.

Neither Blair's conclusory arguments that the statement by the prosecutor violated all standards of human decency and caused the jury to abandon its duty to objectively apply the death penalty nor our study of the record convinces us that the sentencing phase was rendered fundamentally unfair by the part of the prosecutor's closing argument at issue.

This was not the strongest part of the prosecutor's closing argument. The prosecutor delivered a tough, hard-hitting argument which was based on the hard facts presented by this case. His main focus was on establishing at least one of four aggravating circumstances which Missouri requires be present before a jury in order to impose the death penalty. He discussed the murder of Kathy Jo Allen, called it a murder for hire, stressed Blair's monetary gain from the murder, noted Blair's "tough guy" image in prison, talked of the constitutional right of the people of the State of Missouri to sentence a man to death, and stressed that the jury should not give Blair "mercy" just because he was only 20 years old. (Tr. VII 2317–19). During his argument, without pause or repetition, the prosecutor made the challenged statement about the cost of caring for Blair for the next fifty years, which was the only alternative to a death sentence. (Tr. VII 2317).

---

13. It is significant that one of the instructions read to the jury in Blair's sentencing trial was as follows:

> **15.46 Guilty of Capital Murder: Final Decision on the Punishment**
> Even if you decide that a sufficient mitigating circumstance or circumstances do not exist which outweigh the aggravating circumstance or circumstances found to exist, you are not compelled to fix death as the punishment. Whether that is to be your final decision rests with you.

MAI–CR 15.46, MAI–CR 2d 15–57 (1979). (Tr. VII 2332).

14. Were we to conclude that Blair's argument falls properly under the eighth amendment under *Caldwell* and the other similar cases, a very recent decision by the United States Supreme Court, *Sawyer v. Smith,* —— U.S. ——, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990), has held *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), to be a bar. *Sawyer* reasoned that no case before *Caldwell* invalidated a prosecutorial argument as impermissible under the eighth amendment. *Id.* —— U.S. at ——, 110 S.Ct. at 2827. Accordingly, where a conviction became final before *Caldwell,* the *Teague* bar applied. *Sawyer* also held that neither of the two narrow exceptions to *Teague* were applicable. As Blair's conviction became final on October 7, 1982, it predates *Caldwell.* Accordingly, *Teague* would bar an eighth amendment argument.

The argument in *Darden* branded the defendant as an animal on repeated occasions, *see* 477 U.S. at 179 n. 7, 106 S.Ct. at 2470 n. 7, and had the capacity for producing far greater prejudicial impact than the argument at issue in this case. In *Newlon*, in which we affirmed the granting of the writ based on the closing argument, the prejudicial statements were repeated and infected nearly the entirety of the argument. In that case, we outlined the improper statements as follows:

[T]he prosecutor (1) expressed his personal belief in the propriety of the death sentence and implied that he had special knowledge outside the record; (2) emphasized his position of authority as prosecuting attorney of St. Louis County; (3) attempted to link petitioner with several well-known mass murderers; (4) appealed to the jurors' personal fears and emotions; and (5) asked the jurors to *"kill him now. Kill him now."*

*Newlon*, 885 F.2d at 1335 (emphasis added).

Arguments similar to the one made in Blair's case were made in *Tucker* and *Brooks*, but in both they comprised only a brief portion of the prosecutor's closing argument, and in each case the Eleventh Circuit concluded that the defendant's due process rights had not been violated. We compare the argument in this case with others to demonstrate the level at which such behavior necessitates habeas corpus relief.

We are satisfied that the argument in question is not sufficiently prejudicial to fatally infect the proceedings so as to render Blair's sentencing hearing fundamentally unfair.[15]

Accordingly, we conclude that the district court did not err in its conclusion on this issue.

## IV.

Blair argues that, when the trial court refused to instruct the jury on first-degree murder,[16] it violated the due process clause of the fourteenth amendment, the equal protection clause of the fourteenth amendment, and the *ex post facto* clause of article I, section 10, clause 1 of the United States Constitution. These arguments are all unpersuasive.

## A.

■ As a threshold matter, we must consider the State's contention that Blair is procedurally barred from raising these arguments. We believe that we should address the merits of Blair's arguments because the cause and prejudice standard of *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977), is satisfied in this case.

Blair could not have made these arguments until the Missouri Supreme Court decided *State v. Goddard*, 649 S.W.2d 882 (Mo.) (en banc), *cert. denied*, 464 U.S. 997, 104 S.Ct. 495, 78 L.Ed.2d 689 (1983). *Goddard* was decided on April 26, 1983, shortly after Blair filed his state-court collateral attack on his conviction pursuant to Missouri's Rule 27.26, but before that claim was decided. Thus, although Blair's arguments depend only upon well-settled principles of federal law, the factual basis for the claims "was not reasonably available to counsel" before the default. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). Therefore, cause has been established, *see Amadeo v.*

---

**15.** The dissent also discusses the prosecutor's reference to Blair as a black man. There was no objection of any kind to this argument at trial. The motion for new trial, the 27.26 motion and amendments, the petition for writ of habeas corpus and briefs by counsel and filed pro se in this court nowhere raise this issue.

**16.** Missouri law provided, at all relevant times, that: "Any person who unlawfully kills another human being without a premeditated intent to cause the death of a particular individual is

guilty of the offense of first degree murder if the killing was committed in the perpetration of or in the attempt to perpetrate arson, rape, robbery, burglary, or kidnapping." Mo.Rev. Stat. § 565.003 (1979).

On the other hand, Missouri provided at all relevant times, that "[a]ny person who unlawfully, willfully, knowingly, deliberately, and with premeditation kills or causes the killing of another human being is guilty of the offense of capital murder." *Id.* § 565.001 (1979).

*Zant,* 486 U.S. 214, 221–22, 108 S.Ct. 1771, 1776–77, 100 L.Ed.2d 249 (1988); *Murray,* 477 U.S. at 488, 106 S.Ct. at 2645, and we believe that prejudice is sufficiently apparent that an extended analysis is not required.

**B.**

▬▬▬ After *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), states may not force a jury to make a stark choice between acquitting a defendant and imposing the death penalty upon him.[17] In *Beck,* the Supreme Court reviewed an Alabama statute that prevented trial judges from instructing juries on lesser-included offenses of capital murder. Relying upon the due process clause of the fourteenth amendment, the Court held that Alabama had to submit a "third option" to the jury. Theoretically, Beck's jury would have acquitted him unless the prosecution established every element of capital murder beyond a reasonable doubt. Nevertheless, the Court explained that a defendant in a capital case:[18]

> "is entitled to a lesser offense instruction ... precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction."

*Id.* at 634, 100 S.Ct. at 2388 (emphasis in original) (quoting *Keeble v. United States,* 412 U.S. 205, 212–13, 93 S.Ct. 1993, 1997–98, 36 L.Ed.2d 844 (1973)).

This case is unlike *Beck,* because, even after Blair was found guilty of capital murder, the jury was given the option of sentencing him to a prison term. Furthermore, the jury was instructed concerning not only capital murder but also second-degree murder and manslaughter. Blair argues that he was also entitled to a first-degree murder instruction because his offense involved kidnapping.

In effect, Blair argues that *Beck* required the trial court in his case to instruct the jury on every homicide offense defined by Missouri law. This interpretation is incorrect. *Beck* does not prescribe a first-degree murder instruction in this case unless first-degree murder is a lesser-included offense of capital murder, *see id.* at 627, 100 S.Ct. at 2384; and the Missouri Supreme Court held, in the appeal of Blair's conviction, that first-degree murder was not a lesser-included offense of capital murder, *State v. Blair,* 638 S.W.2d 739, 747 (Mo. 1982) (en banc), *cert. denied,* 459 U.S. 1188, 103 L.Ed.2d 838, 74 L.Ed.2d 1030 (1983). Blair, however, challenges the validity of that holding; he argues that, in a series of cases, the Missouri Supreme Court has answered that question inconsistently. We now turn to this equal protection argument.

**C.**

▬▬▬ Blair's equal protection claim is based upon the treatment by several Missouri Supreme Court decisions of statutory amendments dealing with whether first-degree murder was a lesser-included offense of capital murder. A statute declaring first-degree murder a lesser-included offense of capital murder was repealed effective January 1, 1979. *See* Mo.Rev.Stat.

---

17. *But see Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). In *Spaziano,* six Justices held that *Beck* was not violated when Florida refused to instruct on a lesser-included offense for which the statute of limitations had run. A plurality of four Justices would have required an instruction if defendant was willing to waive the statute of limitations defense with respect to that charge. *Id.* at 456–57, 104 S.Ct. at 3160–61 (Blackmun, J., joined by Burger, C.J., Powell, J., and O'Connor, J.). Two Justices disagreed with the plurality's intimation that *Beck* "requires a state court ... to permit the defendant to waive the statute of limitations and to give a lesser-included-offense instruction as to an offense that would otherwise be barred." *Id.* at 467, 104 S.Ct. at 3166 (White, J., joined by Rehnquist, J., concurring).

18. The Supreme Court stated in *Beck* that it did "not decide whether the Due Process Clause would require the giving of [lesser included offense] instructions in a noncapital case." 447 U.S. at 638 n. 14, 100 S.Ct. at 2390 n. 14.

§ 556.220 (repealed 1979).[19] After January 1, 1979, a new statute provided that:

1. A defendant may be convicted of an offense included in an offense charged in the indictment or information. An offense is so included when

(1) It [was] established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

(2) It [was] specifically denominated by statute as a lesser degree of the offense charged....

. . . .

2. The court shall not be obligated to charge the jury with respect to an included offense unless there is a basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense.

Mo.Rev.Stat. § 556.046 (1979).[20] Although these modifications occurred in 1979, the Missouri Supreme Court did not specifically address them until *State v. Baker*, 636 S.W.2d 902 (Mo.1982) (en banc), *cert. denied*, 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983). *See Goddard*, 649 S.W.2d at 887–89; *id.* at 890–92 (Welliver, J., dissenting).

The first case decided after the amendments was *State v. Gardner*, 618 S.W.2d 40 (Mo.1981). The crime in *Gardner*, however, occurred in 1978, before the amendments. The defendant in *Gardner*, who was charged with capital murder, claimed that the trial court should have instructed the jury on first-degree murder. The Missouri Supreme Court accepted the defendant's argument and held that "[t]he failure to instruct on first degree murder [in a capital murder case] ... requires reversal of the judgment of conviction." *Id.* at 41.

In so holding, the court did not acknowledge the amendments.

In *Baker*, 636 S.W.2d 902, the issue was whether "it is error, when only capital murder is charged, to fail to submit a first degree murder instruction in a trial for capital murder *committed after January 1, 1979.*" *Id.* at 904 (emphasis in original). The court distinguished *Gardner*, because the crime in *Gardner* occurred in 1978. *Id.* The court also recognized that under the amended version of section 556.046, "an offense can be a lesser included offense of another either: (1) when its elements are necessarily included therein, or (2) when by statute it is specifically denominated as a lesser degree of the offense charged." *Id.* The court concluded that "first degree murder is not a lesser included offense of capital murder on their elements," because one can be convicted of first-degree murder only if he commits an independent felony, while a capital murder conviction requires no such proof. *Id.* Also, first-degree murder was not specifically denominated by statute as a lesser-included offense of capital murder. *Id.* Therefore, the court held that, under the new statutory scheme, the first-degree murder instruction need not be given, since "first degree murder is not a lesser included offense of capital murder." *Id.*

The Missouri Supreme Court decided Blair's appeal soon after it decided *Baker*. Relying upon *Gardner*, Blair argued in his appeal that "the trial court erred in failing to give an instruction on first-degree murder because there was evidence that the murder occurred during the commission of kidnapping, burglary, and robbery." *Blair*, 638 S.W.2d at 746–47 (citation omitted). Since Blair was convicted of a crime which occurred on August 31, 1979, the

**19.** The repealed statute provided:

Upon indictment for any offense consisting of different degrees, ... the jury may find the accused not guilty of the offense charged in the indictment, and may find him guilty *of any degree of such offense inferior to that charged in the indictment,* or of an attempt to commit such offense, or any degree thereof....

Mo.Rev.Stat. § 556.220 (emphasis added) (repealed 1979).

**20.** Another amendment took effect on September 28, 1979. Before the amendment, first-degree murder instructions had to be given in every capital murder case. *See* Mo.Rev.Stat. § 565.006.1 (amended 1979). After the amendment, however, section 565.006.1 provided that, in capital murder cases, courts "shall not give instructions on any lesser included offense which could not be supported by the evidence presented in the case." *Id.* (1979).

court relied upon *Baker*'s holding that first-degree murder was not a lesser-included offense of capital murder and rejected Blair's argument. *See id.* at 747.

Blair's argument that there is an inconsistency in the Missouri Supreme Court decisions on whether first-degree murder is a lesser-included offense of capital murder arises primarily from *Goddard,* 649 S.W.2d 882. The defendant in that case had been charged with capital murder before *Baker* was decided, but was convicted of first-degree murder. He claimed that the trial court should not have instructed the jury on first-degree murder for two reasons: (1) he was not charged with first-degree murder; and (2) *Baker* established that first-degree murder was not a lesser-included offense of capital murder. *See id.* at 887. The court rejected Goddard's argument, holding that he "was on clear notice at the time of the homicide and his trial that he could be convicted of first degree murder even though he was formally charged with [only] capital murder." *Id.* at 889. This conclusion was supported by the fact that *Gardner,* which had ruled that first-degree murder was a lesser-included offense of capital murder, was decided only a few months before the trial in *Goddard. See id.* at 887. The court recognized that defendants cannot be convicted of any offense of which the information or indictment did not give them fair notice, but concluded that defendants who were charged with capital murder before *Baker* were aware that they might be convicted of first-degree murder. Because defendants who were tried for capital murder after *Baker* would not have such notice, the court acknowledged that they could not be convicted of first-degree murder. It stated that the conviction of murder in the first-degree was a mitigation of the offense charged, rather than a conviction of something other than what was charged, and that reversal was not required because the trial court followed the long approved form of submission. *Id.* at 889. The court stated that while Goddard, as a matter of due process, could not be convicted of any offense of which he did not have fair notice, "*Baker* is not retroactive, but prospective,

in its application and the trial court did not commit reversible error in submitting first degree murder." *Id.* This last statement is the root of Blair's equal protection claim, because he argues that *Baker* was applied retrospectively to him.

Shortly after *Goddard,* the Missouri Supreme Court decided *State v. Holland,* 653 S.W.2d 670 (Mo.) (en banc). As in *Goddard,* the defendant in *Holland* had been charged with only capital murder but was convicted of first-degree murder after the jury was instructed on both offenses. The Missouri Supreme Court stated that the issue was whether the defendant had adequate notice that he might be convicted of first-degree murder. *Id.* at 674. Because Holland had been tried before *Baker* was decided, the court held that he "had an abundance of notice that first degree murder was going to be submitted to the jury." *Id.* The court also indicated that its decision did not "intrude upon the solution of *State v. Baker* to the failure to instruct down to . . . first-degree murder." *Id.*

These cases fall into two distinct categories. In the first category, exemplified by *Baker* and *Blair,* defendants who were convicted of capital murder argued that the jury *should* have been instructed on first-degree murder. The second group consists of cases such as *Goddard* and *Holland,* in which defendants had been charged with only capital murder but had been convicted of first-degree murder. The defendants in this second line of cases argued that the jury *should not* have been instructed on first-degree murder.

The first step in analyzing Blair's equal protection challenge is to determine the appropriate standard of scrutiny. The distinction between these two groups of defendants will be upheld if it is rationally related to a legitimate state interest. *See Evans v. Thompson,* 881 F.2d 117, 121 (4th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3255, 111 L.Ed.2d 764 (1990); *Dickerson v. Latessa,* 872 F.2d 1116, 1119–20 (1st Cir.1989); *Williams v. Lynaugh,* 814 F.2d 205, 208–09 (5th Cir.), *cert. denied,* 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 270 (1987). For the reasons given below, we

hold that there is a rational distinction between the two groups of defendants.

■ The *Goddard–Holland* line of cases implicates the rule that a defendant's sixth amendment " 'right to reasonable notice of the charge against him ... is incorporated in the Fourteenth Amendment to the United States Constitution and thus cannot be abridged by the states.' " *Franklin v. White*, 803 F.2d 416, 417 (8th Cir.1986) (per curiam) (quoting *Goodloe v. Parratt*, 605 F.2d 1041, 1045 (8th Cir. 1979)), *cert. denied*, 481 U.S. 1020, 107 S.Ct. 1904, 95 L.Ed.2d 510 (1987).[21] However, the states are not bound by the technical rules governing federal criminal prosecutions; the crucial question in state prosecutions is whether the defendant had sufficient notice of the potential charges against him that he could prepare to contest those charges. *See Johnson v. Trickey*, 882 F.2d 316, 320 (8th Cir.1989); *Wright v. Lockhart*, 854 F.2d 309, 312 (8th Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 2077, 104 L.Ed.2d 642 (1989); *Franklin*, 803 F.2d at 418; *see also Hulstine v. Morris*, 819 F.2d 861, 864 (8th Cir.1987) ("Due Process requirements may be satisfied if a defendant receives *actual notice* of the charges against him, even if the indictment or information is deficient.") (emphasis in original), *cert. denied*, 484 U.S. 1068, 108 S.Ct. 1034, 98 L.Ed.2d 998 (1988); *Williams v. Nix*, 751 F.2d 956, 961 (8th Cir.) ("The omission of any express mention of felony murder from the indictment ... did not affect any of the [the defendant's] substantial rights.... In the federal courts such a de facto amendment of an indictment might raise serious problems, but the Supreme Court has held that the Fourteenth Amendment does not require the states to use grand-jury indict-

ments at all, even to prosecute serious crimes."), *cert. denied*, 471 U.S. 1138, 105 S.Ct. 2681, 86 L.Ed.2d 699 (1985).

In *Holland* and *Goddard*, the Missouri Supreme Court recognized these notice requirements. However, in each case, the court held that the trial court could submit a first-degree murder instruction to the jury because, at the time of the trials, the defendants had notice that anyone who was charged with capital murder could be convicted of first-degree murder.

■ Concerns about reasonable notice are not implicated in the *Baker–Blair* category of cases.[22] Rather, the question is whether either state law or *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), requires the submission of a first-degree murder instruction to the jury. We cannot review the state law questions, *Wainwright v. Sykes*, 433 U.S. 72, 81, 97 S.Ct. 2497, 2503, 53 L.Ed.2d 594 (1977) (stating that "a state decision resting on an adequate foundation of state substantive law is immune from review in the federal courts"); *Woods v. Solem*, 891 F.2d 196, 199 (8th Cir.1989) (stating that "these are conclusions of state law that we may not reexamine"), *cert. denied*, — U.S. —, 110 S.Ct. 1952, 109 L.Ed.2d 314 (1990), and we have already concluded that *Beck* is satisfied in this case.

The two groups of cases are thus derived from two distinct sets of legal principles. The Missouri Supreme Court recognized the difference between the two types of cases in both *Holland* and *Goddard*. *See Holland*, 653 S.W.2d at 674; *Goddard*, 649 S.W.2d at 889 & n. 1. For example, the court stated in *Holland* that its decision turned on the issue of notice, and thus did not "intrude upon the solution of *State v.*

---

**21.** *See also Jackson v. Virginia*, 443 U.S. 307, 314, 99 S.Ct. 2781, 2786, 61 L.Ed.2d 560 (1979) (stating that due process demands "that a person [not] incur the loss of liberty for an offense without notice and a meaningful opportunity to defend"); *Cole v. Arkansas*, 333 U.S. 196, 201, 68 S.Ct. 514, 517, 92 L.Ed. 644 (1948) ("No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused

in a criminal proceeding in all courts, state or federal.").

**22.** Other cases involving refusals to give a first-degree murder instruction and crimes that occurred after January, 1979, are *State v. Williams*, 652 S.W.2d 102 (Mo.1983) (en banc), *State v. Betts*, 646 S.W.2d 94 (Mo.1983) (en banc), and *State v. Woods*, 639 S.W.2d 818 (Mo. 1982).

*Baker* to the failure to instruct down to first degree murder." 653 S.W.2d at 674 (citation omitted). Although Judge Welliver, dissenting in *Goddard*, said that the Missouri cases had created a "classic catch–22" for defendants, 649 S.W.2d at 890 (Welliver, J., dissenting), he did not address the differences between the two groups of cases. Interestingly, in *Holland*, Chief Justice Rendlen referred to "the dissenting opinion which compares apples with oranges." 653 S.W.2d at 678 (Rendlen, C.J., concurring).

Blair's argument, at its base, must rest upon *Goddard's* holding that *Baker* would apply only prospectively. However, that statement was made in dealing with issues where due process considerations of reasonable notice were involved and would have mandated the result. We cannot conclude that Blair was deprived of equal protection by *Goddard's* holding, after Blair's appeal was decided.

Nor do we believe that two pre-*Baker* cases, *State v. Fuhr*, 626 S.W.2d 379 (Mo. 1982), and *State v. Daugherty*, 631 S.W.2d 637 (Mo.1982), support Blair's argument. Although the crimes involved in both *Fuhr* and *Daugherty* occurred after January, 1979, neither case referred to the 1979 statutory change. Moreover, both cases relied upon cases involving crimes that were committed before January, 1979, *see State v. Gardner*, 618 S.W.2d 40 (Mo.1981), and *State v. Wilkerson*, 616 S.W.2d 829 (Mo. 1981) (en banc), to support their holdings that convictions should be reversed because of the failure to instruct on first-degree murder. *Goddard* commented that both *Fuhr* and *Daugherty* "appear to be necessarily overruled by *Baker*." 649 S.W.2d at 888 (emphasis not in original). *Daugherty*, it must also be added, is a case that falls in

the *Goddard–Holland* category. These cases do not establish an equal protection violation.

 Because there is a rational distinction between the two categories of cases, we cannot conclude that there has been a violation of Blair's equal protection interests. We also observe that even if first-degree murder were a lesser-included offense of capital murder, the district court held that Blair's argument was untenable because the state trial court had found that there was insufficient evidence to support a separate charge of first-degree murder. *See* 643 F.Supp. at 790.[23]

D.

 Blair claims that the Missouri Supreme Court transgressed the *ex post facto* clause of the United States Constitution by applying *Baker's* holding retrospectively to him. This argument is unpersuasive because, for the purposes of the *ex post facto* clause, *Baker's* holding is merely a procedural change that can be applied retrospectively.

 Technically, the *ex post facto* clause does not proscribe the retrospective application of judicial decisions, because "[t]he *Ex Post Facto* Clause is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government." *Marks v. United States*, 430 U.S. 188, 191, 97 S.Ct. 990, 992, 51 L.Ed.2d 260 (1977) (citation omitted). However, the principles that underlie the *ex post facto* clause operate through the due process clause of the fourteenth amendment to prevent state courts from making certain unforeseeable doctrinal changes. *See id.* at 192, 97 S.Ct. at

23. Missouri cases make it clear that kidnapping *should not be charged* where the movement or confinement is merely incidental to another offense, and that to make this determination it is necessary to consider whether there was any increased risk of harm or danger to the victim that was not present as a result of the other offenses. *See Williams v. Armontrout*, 912 F.2d 924, 929–930 (8th Cir.1990). In this case, in which Allen was removed from her apartment to a parking lot in an urban area where her screams could be clearly heard by occupants of

nearby apartments, we cannot conclude that there is constitutional error in the trial court's determination that there was no submissible issue of kidnapping. *See State v. Erby*, 735 S.W.2d 148, 149 (Mo.Ct.App.1987); *State v. Jackson*, 703 S.W.2d 30, 32–33 (Mo.Ct.App.1985). Blair's motion for new trial claimed that the trial court erred in refusing the first-degree murder instruction on the sole ground that there was evidence to support it. The denial of this motion is a ruling by the trial court on this issue.

993; *Bouie v. City of Columbia,* 378 U.S. 347, 353–54, 84 S.Ct. 1697, 1702–03, 12 L.Ed.2d 894 (1964).

■ The *ex post facto* clause, however, does not prohibit the retrospective application of new procedural, as opposed to substantive, rules. *Dobbert v. Florida,* 432 U.S. 282, 292–93, 97 S.Ct. 2290, 2297–98, 53 L.Ed.2d 344 (1977). Significantly, the realm of changes which are considered procedural for this purpose is quite large. *See id.* at 292–97, 97 S.Ct. at 2297–2300; *Thompson,* 881 F.2d at 120–21.

In *Dobbert,* the Supreme Court held that a change in the sentencing powers of judges and juries in death penalty cases was merely procedural. Prior to the change, a defendant who was convicted of capital murder was sentenced to death unless a majority of the jury recommended leniency. *See* 432 U.S. at 288 & n. 3, 97 S.Ct. at 2296 & n. 3. After the change, the jury was relegated to the task of rendering an advisory decision. *See id.* at 291, 97 S.Ct. at 2297. The Court concluded that the modification was merely procedural because " '[t]he crime for which the present defendant was indicted, the punishment prescribed therefor, *and the quantity or the degree of proof necessary to establish his guilt,* all remained unaffected by the subsequent [change].' " 432 U.S. at 294, 97 S.Ct. at 2298 (emphasis added) (quoting *Hopt v. Utah,* 110 U.S. 574, 589–90, 4 S.Ct. 202, 209–10, 28 L.Ed. 262 (1884)).

We also believe that recent decisions by the Fourth and Tenth Circuits provide a valuable benchmark against which to measure Blair's argument. *See Evans,* 881 F.2d 117; *Coleman v. Saffle,* 869 F.2d 1377 (10th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1835, 108 L.Ed.2d 964 (1990). In both cases, state law originally provided that if a death sentence were declared invalid, the sentence would be replaced automatically by a sentence of life imprisonment. *See Evans,* 881 F.2d at 119; *Coleman,* 869 F.2d at 1385. After the state laws were modified, an invalid death sentence could be followed by a valid death sentence. *See Evans,* 881 F.2d at 119; *Coleman,* 869 F.2d at 1385. Both courts held that these changes, which increased the probability that the defendant will be sentenced to death, were merely procedural. *See Evans,* 881 F.2d at 120; *Coleman,* 869 F.2d at 1387.

In light of these cases, we reject Blair's *ex post facto* argument. Blair was convicted of capital murder. Neither the definition of that crime nor the accompanying punishment changed between the murder and the trial.

### V.

■ In Blair's pro se brief, he argues that his constitutional right to effective assistance of counsel was infringed when his court-appointed counsel failed to raise all exhausted issues in the district court and on appeal. We have considered and rejected Blair's argument urged pro se with respect to the first-degree murder instruction.[24] Blair in his pro se brief makes specific reference to only one other issue, that the trial judge spoke directly with the jury without his being present. The state postconviction proceedings determined that this discussion dealt only with whether court would be held on Saturday and specifically rejected any claim that there had been mention of any security problems.[25]

The issue raised by the dissent as to failure to call two witnesses was considered to be a question of trial strategy in

---

**24.** This issue was thoroughly briefed before this court in *Williams v. Armontrout,* 912 F.2d 924 (8th Cir.1990).

**25.** At the 27.26 hearing the trial judge testified that he spoke briefly with the jury to answer a question about whether court would be held on a given Saturday during the trial. He denied that there was mention of any security problems. In ruling the 27.26 motion the circuit court found that there was no merit to the claim of misconduct of the trial judge, making specific reference to this testimony. The court of appeals in its affirming memorandum relied upon these findings and commented that there was no evidence introduced to the contrary with respect to the judge's denial of any comment about security. Further, there was nothing to demonstrate prejudice about the fact that this comment was not transcribed in the record.

the state postconviction proceedings. This issue was not specifically raised either in the pro se brief or by counsel, either before the district court or this court.[26]

We find it difficult to see how the exacting standards of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), could be met in either of the latter two respects.

■■■ We must also recognize that it has not heretofore been held that there is a constitutional right to representation in a habeas action. *Johnson v. Avery*, 393 U.S. 483, 488, 89 S.Ct. 747, 750, 21 L.Ed.2d 718 (1969); *Hooks v. Wainwright*, 775 F.2d 1433, 1438 (11th Cir.1985); 17A C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 4268.4, at 524 (1988); *cf. Murray v. Giarratano*, —— U.S. ——, 109 S.Ct. 2765, 2769–72, 106 L.Ed.2d 1 (1989) (holding that states are not required to appoint counsel for prisoners who are collaterally attacking their convictions and death sentences in state court); *Miller v. Keeney*, 882 F.2d 1428, 1432 (9th Cir.1989) (rejecting an ineffective assistance of counsel claim that was based upon an attorney's decision not to file a petition for a writ of certiorari). As ineffective assistance of counsel claims spring from the right to counsel contained in the sixth amendment, *Strickland*, 466 U.S. at 684–86, 104 S.Ct. at 2062–64, it follows that there is no constitutional underpinning for the claimed right to effective assistance in this habeas action. We recognize that Congress is now considering legislation that would encourage states to provide counsel in habeas and review of death cases, but that does not assist us in considering this case.

We cannot conclude that Blair's most general argument that all unexhausted issues should be raised justifies relief or requires further consideration.

## VI.

■■■ Finally, the State cross-appeals from the district court's order disqualifying the Missouri Attorney General's Office from appearing in this case. The district court disqualified the entire office because a member of the office, when serving as a public defender, had represented Blair during various attempts to attack his conviction.

In reaching its conclusion, the district court primarily relied upon the decisions in *Arkansas v. Dean Foods Products Co.*, 605 F.2d 380 (8th Cir.1979), *overruled on other grounds, In re Multi–Piece Rim Products Liability Litigation*, 612 F.2d 377, 378 (8th Cir.1980), and in *State v. Croka*, 646 S.W.2d 389 (Mo.Ct.App.1983). Neither decision supports the continued disqualification of the entire office.

In *Dean Foods Products*, this court affirmed a district court order disqualifying an Assistant Attorney General from taking part in an antitrust action against a defendant that was being represented by his former law firm. *See* 605 F.2d at 382, 384–86. Moreover, the court disqualified those members of the Attorney General's staff who had actively participated in the case under the supervision of the disqualified attorney. *See id.* at 387. The court explicitly reserved judgment on whether the conflict should have resulted in the imputed disqualification of the entire Attorney General's office. *See id.* at 387 n. 9.

The Missouri Court of Appeals in *Croka* disqualified the entire Saline County Prosecuting Attorney's Office because an attorney in the office had obtained confidential information from the defendant while representing the defendant. 646 S.W.2d at

---

**26.** The dissent discusses the claim of ineffective assistance of counsel in failing to call two witnesses listed in the police report as present near the homicide scene. The record contained testimony of the experienced defense counsel that he was aware of the two witnesses, Q.T. Lee and Clarence Wilson, and concluded that they should not be called as "it was inconsistent with the theory of defense that we are presenting." (27.26 Hearing Tr. 134–35). In ruling the 27.26 motion, the state court concluded that this point was a matter of trial strategy, referred to counsel's testimony and held that there was no ineffective assistance by not calling the two witnesses. (Order Cir.Ct. 18–19). The Missouri Court

392–93.[27]

We do not think that *Dean Foods Products* and *Croka* required the district court to disqualify the entire Office of the Attorney General in this case. The United States District Court for the Western District of Missouri had adopted the Missouri Code of Professional Responsibility, "as amended from time to time" by the Missouri Supreme Court. W.D.Mo.R. 2(D)(2). Rule 1.11 of the Missouri Rules of Professional Conduct, which regulates successive government and private employment, disqualifies a government attorney from "participat[ing] in a matter in which the lawyer participated personally and substantially while in private practice or nongovernmental employment." Rule 1.11(c)(1), *reprinted in* Missouri Supreme Court Rule 4. The commentary accompanying that section explicitly states that "[p]aragraph (c) does not disqualify other lawyers in the agency with which the lawyer in question has become associated." Under these rules, we believe that a screening mechanism or Chinese Wall could be implemented to avoid disqualifying the entire Attorney General's office. This result is consistent with academic commentary. *See, e.g., Developments in the Law: Conflicts of Interest in the Legal Profession*, 94 Harv.L. Rev. 1244, 1367–70 (1981); Comment, *The Chinese Wall Defense to Law–Firm Disqualification*, 128 U.Pa.L.Rev. 677 *passim* (1980).

## VII.

We affirm the denial of the writ and reverse the district court's order concerning disqualification.

HEANEY, Senior Circuit Judge, concurring and dissenting.

"[H]ard cases ... make bad law." *Northern Securities Co. v. United States*,

193 U.S. 197, 400, 24 S.Ct. 436, 468, 48 L.Ed. 679 (1903) (Holmes, J., dissenting). Capital punishment, because it receives an attention far out of proportion to its usefulness in the criminal law, exerts a "hydraulic pressure" on courts. *Cf. id.* at 401, 24 S.Ct. at 468. This is a hard case because a 21–year old woman was murdered and society rightfully insists that someone pay for the crime. Justice demands, however, that constitutional standards be followed in obtaining and sustaining a conviction. Blair advances three meritorious reasons why the district court's judgment denying the writ of habeas corpus should be set aside.

First, the prosecution knowingly introduced false testimony at trial to prevent the impeachment of the state's chief witness, Ernest Jones, violating Blair's due process rights under the fourteenth amendment.

Second, the trial court erred by not giving the jury an instruction on first-degree murder as an alternative to the charge of capital murder. This decision, as affirmed by the Missouri Supreme Court, violated Blair's equal protection and due process rights.

Third, Blair's sentencing hearing was compromised by the prosecutor's inflammatory closing argument: he told the jury that they should sentence Blair to death because it was cheaper to kill him than to incarcerate him; he improperly made reference to Blair's assertion of his constitutional rights; and he emphasized to the all-white jury, from which he had struck four black candidates, the difference in race between the "attractive" sympathetic victim and "this black man." This argument violated the eighth amendment and the equal protection clause of the fourteenth amendment.[1]

of Appeals affirming this argument also referred to the testimony of defense counsel.

**27.** The state argues that the relevant portion of the *Croka* opinion is dictum. While it is technically correct that the discussion had no effect on the disposition of the appeal, 646 S.W.2d at 393, the ruling on the disqualification was not

merely gratuitous, because the court remanded the case to the trial court, with instructions based upon the disqualification argument, *id.*

**1.** I concur in Section VI of the majority opinion that disqualification of the Attorney General's office was unnecessary.

## I.

Walter Blair was convicted of capital murder at age twenty. The jury found that he accepted a contract to kill a witness expected to testify in the rape trial of Larry Jackson. The evidence of the formation of this contract came exclusively from the testimony of Ernest and Sharon Jones. The Joneses testified that Blair made statements prior to the homicide evidencing premeditation and that as further evidence of premeditation, Blair kept the victim's driver's license to show the Jackson family to collect his money. In his statements to the police, however, Blair confessed to kidnapping the victim so that she would not testify at Jackson's trial. In the statements, Blair alleges that he killed her when she later resisted and tried to escape. The State introduced circumstantial evidence which established that Blair was at the victim's house when she was kidnapped. Forensic testimony established that the shots were fired at close range. The murder weapon was found at the apartment of Blair's girlfriend. There was no evidence of any change in Blair's net worth.

Blair's theory at trial was that Ernest Jones killed the victim; that Ernest Jones framed Blair; and that the police, believing that Blair was the right man, engaged in questionable tactics to get a conviction. In particular, Blair was able to show that the murder weapon had been stolen five years previously by Ernest Jones. Trial transcript, vol. 6 at 2163–65. The victim's boyfriend, who had been with her when she was kidnapped, identified Ernest Jones as the kidnapper in a police lineup. *Id.*, vol. 4 at 1109–12. Ernest Jones and his brother, Fred, pawned the boyfriend's ring, which was taken at the time of the victim's abduction. *Id.* at 1430. The police traced Fred Jones from the pawn shop. Fred Jones was arrested and initially gave Ernest Jones' name in connection with the ring; he

did not mention Blair. *Id.* at 1433. The police arrested Ernest Jones for murder. It was only after the lineup that Ernest Jones implicated Blair. *Id.*, vol. 5 at 1519.

At trial, Blair testified that he had signed the statements written by the police only because of their interrogation tactics. There was testimony that the police were angry about this case because the victim had previously asked for their protection and they had refused, leading to bad publicity and public pressure after the homicide. *Id.*, vol. 6 at 1850–52. Blair testified that after his arrest, he repeatedly requested a lawyer, but the police refused. *Id.* at 1994, 1997–98. One police officer allegedly put a gun to Blair's head. *Id.* at 1999–2001. A second officer interceded and told Blair that they only wanted him to implicate Jackson. *Id.* The same officer said that they had seven witnesses who could name Blair as the murderer if he would not talk. *Id.* at 2002. They threatened charging his girlfriend with murder. *Id.* at 2003–04. Finally, they offered a deal for twelve years incarceration if he would testify against Jackson and promised they would draft a statement that would result in his being incarcerated for twelve years. *Id.* at 2005. In the statement, Blair confessed to felony murder. After signing the prepared statement, but before giving a similar video statement, Blair encountered his attorney in a hallway. Blair identified his lawyer to the prosecutor and the police, but Blair and his lawyer were physically separated by the prosecutor and the police.[2]

The jury disbelieved Blair and convicted him of capital murder. In a second stage of the proceeding, the jury voted for the death penalty. Blair's conviction was affirmed on appeal, *State v. Blair*, 638 S.W.2d 739 (Mo.1982) (en banc), and his conviction became final on January 24, 1983 with the denial of certiorari. *Blair v.*

---

**2.** In light of the state findings regarding the voluntariness of the written statement which contained the same admissions as the videotape, I withhold judgment as to the admissibility of the video confession. I note, however, that in *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), the suspect was unaware that a defense counsel had been retained for

him and was trying to contact him. *Id.* at 417, 106 S.Ct. at 1138. In this case, counsel and Blair met in the hallway and were physically separated. Blair might well have thus thought that the declaration of his right to counsel was boilerplate and that any request for counsel thereafter would have been futile.

*Missouri,* 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983). His state post-conviction petition was denied after a hearing. The district court denied Blair's habeas petition without a hearing. *Blair v. Armontrout,* 643 F.Supp. 785 (W.D.Mo.1986).

I note that the jury did not have all the relevant information before it at the guilt stage. First, Blair's defense attorneys failed to call two witnesses listed in police reports as present near the homicide scene. One would have given a description of a man fleeing the scene consistent with that of Ernest Jones and a description of the fleeing man's clothing inconsistent with the State's evidence of Blair's attire that day. *Blair v. Missouri,* No. CV83–6637, 27.26 hearing transcript at 163, 183–84 (Mo. Cir.Ct. June 20, 1983) (post-conviction review).[3] Second, the jury did not know that some of the testimony of the State's star witness, Ernest Jones, was perjured. I begin by examining the perjured testimony.

## II.

The State's chief witness, Ernest Jones, perjured himself at trial with the knowing complicity of the prosecutor. He testified that no deal had been made with respect to pending charges against him in exchange for his testimony. In fact, leniency promises were made to Jones before trial. The state court reviewing Blair's post-conviction petition, however, found that there was no "deal," and the majority accepts this "fact finding." Both seem to accept the erroneous premise that promises of leniency do not constitute a deal that must be disclosed to the defense. Even where some of the terms of a deal remain undecided, however, promises of leniency must be disclosed. Moreover, there is evidence that the prosecutor deliberately deceived the trial court and the defense to minimize the impeachment of Jones.

### A.

Ernest Jones testified that Blair had always planned to kill the victim. Trial transcript, vol. 5 at 1472–73. This testimony supplied the evidence of premeditation necessary for capital murder. At the time of trial, Jones was on probation for a prior burglary conviction and was under indictment for assault in the first degree, burglary, and drug possession. *Id.* at 1499. These pending charges could have led to a sentence of twenty years or life. *Missouri v. Jones,* No. Cr 80–02916, sentencing tran-

---

**3.** This claim was raised fully before the state courts but was not presented in Blair's habeas corpus petition prepared by his appointed counsel. The majority rejects Blair's pro se claim of ineffective assistance on the grounds that Blair has no right to counsel in a habeas proceeding, and thus no right to effective assistance. The majority also concludes that there is no prejudice because they considered and rejected all of Blair's claims. I disagree.

First, the majority did not consider all of his claims. Blair requested that all of his exhausted state claims be raised in the habeas petition and on appeal to us. Blair Pro Se Appellate Brief at 23; Appellant's Brief at 2, n. 1. The majority has considered only one of those claims, the failure to give a first-degree murder instruction. Second, according to Blair, his counsel deceived him regarding the grounds that would be presented to the district court. Counsel agreed to present all the exhausted state claims, but failed to do so and never provided Blair with a copy of the habeas petition. Pro se brief at 22. Thus, at issue is not merely the judgment of counsel in not presenting certain claims, but the allegation as well that counsel lulled Blair into not presenting other claims pro se before the district court.

While there is no absolute right to the appointment of counsel in habeas proceedings at present, due process requires counsel in complex cases. *Hooks v. Wainwright,* 775 F.2d 1433, 1438 (11th Cir.1985), *cert. denied,* 479 U.S. 913, 107 S.Ct. 313, 93 L.Ed.2d 287 (1986); *see also* 18 U.S.C.A. § 3006A(g) (appointment in the interests of justice). This is a complex case. Moreover, the absence of a general right to appointment does not mean that once counsel is appointed, no restraints imposed by law remain on his representation. *Cf. Goldberg v. Kelly,* 397 U.S. 254, 261, 90 S.Ct. 1011, 1016, 25 L.Ed.2d 287 (1970) (while states are not required to provide welfare, termination of benefits must comport with procedural due process). Blair can raise this due process claim in a second petition. Moreover, he also has persuasive grounds for a second petition in counsel's deception of him. *See* Dist.Ct.Rules for § 2254 cases, rule 9 (new grounds justify second petition unless it is an abuse of the writ). Under a second petition, the district court would have to judge the prejudicial effect of any error cumulatively with errors admitted on this appeal but not found sufficiently prejudicial in isolation.

script at 2, 9–10 (Mo.Cir.Ct. Nov. 24, 1980); Mo.Ann.Stat. §§ 557.021, 565.050, 569.160, 195.202 (Vernon 1979 & Supp.1990).

The defense asked for disclosure of any deals or promises made with respect to Ernest Jones' pending charges. Trial transcript, vol. 1 at 346; 27.26 transcript at 128. No deals or promises with respect to the pending charges were revealed before or during trial. It was disclosed immediately before trial that Jones would not be charged as an accomplice for pawning the boyfriend's ring and that his probation would not be revoked for this act. At trial, Jones testified under questioning from the prosecution that no deals were made with respect to the charges for which he was under indictment. Trial transcript, vol. 5 at 1498.

One month after Blair's trial ended, a plea bargain was recorded in the pending cases against Ernest Jones by one of the prosecutors from Blair's trial, Bell, in front of the judge who had presided over the Blair trial. The State dismissed the narcotic charges, reduced the assault charges to a class B felony with a recommendation of three years probation, and recommended no revocation of Jones' then current probation. *Missouri v. Jones*, sentencing transcript at 2–3.[4] Bell explained to the court that his lenient recommendation was motivated by the cost of incarcerating Jones out of state and by Jones' cooperation in the *Blair* case:

> [H]e was one of the State's star witnesses in State of Missouri versus Walter Blair.
>
> I had several discussions with Mr. Jones and his attorney prior to his testifying, telling him that I thought for tactical reasons it would be better not to discuss the specifics of a plea bargain in this case, but that I would make sure and recommend a lenient disposition of this case in exchange for his probation—or words to that effect—or in exchange for his cooperation. Words to that effect.

... [T]he court will recall the testimony and the cooperation of Mr. Jones in State of Missouri versus Walter Blair. THE COURT: I'm reluctant to do so but except for what happened in the Blair case I wouldn't be willing to go along. But I have intimate knowledge of what took place in that case and I do remember Mr. Jones' testimony.

*Id.* at 4–7 (emphasis added). The court accepted the plea bargain and Jones did not receive any jail time for any of the offenses.

Blair again raised the possibility of an undisclosed deal between the State and Jones at Blair's state post-conviction hearing. Jones' attorney, Assistant Public Defender Peter Sterling, testified that he discussed Jones' situation with Bell before Blair's trial. When asked if he reached an agreement with Bell, Sterling replied "yes and no." 27.26 transcript at 63. According to Sterling, Bell indicated:

> that Mr. Jones was going to be a witness against Walter Blair and therefore we weren't, between us, going to have any certain problems in the case working it out but that he did not want to enter into any specific agreement at that time because of Mr. Jones' status as a State's witness.

*Id.* at 64. The State then objected to any further references to a deal, arguing that Sterling had testified that there was none. The court asked Sterling: "Did you reach any agreement?" *Id.* Sterling replied: "I would, Your Honor, call it a tacit agreement based on my working relationship with Mr. Bell and we have had numerous serious cases together." *Id.* The Court asked for clarification. "THE WITNESS: In other words, there was no words spoken from which one could state that there was a contract. It was unspoken understanding that at the conclusion of, Mr. Bell—THE COURT: Well, I'm going to sustain the objection at that point, thank you." *Id.* at 65. The court did not let Sterling finish his answer or let him de-

---

**4.** It appears that the burglary charge was part of the assault case, but the record is unclear.

27.26 transcript at 88, 166.

scribe upon what elements of their working relationship Sterling relied.

Sterling was allowed to testify that he told Jones that Bell had not agreed to a specific plea bargain, but that based on their conversations regarding Jones and on Sterling's past dealings with Bell, Jones could expect leniency and no jail time. *Id.* at 67–68; *accord id.* at 71; (advice given to Jones that he would not go to jail was not "speculative" in Sterling's view) (offer of proof). Sterling was asked: "Did you feel that you had an understanding with Mr. Bell that your client would not go to the penitentiary? A. Yes I did." *Id.* at 68; *accord id.* at 72 (offer of proof); *id.* at 81 ("I believe there was an understanding. There was no specific plea agreement until after the trial."); *id.* at 88–89 (understanding that Jones would not go to the penitentiary). When asked which factors influenced his judgment, Sterling replied, "Well there was what you might call custom and practice.... Probably the main thing that entered into my impressions of what we were doing is my working relationship with Mr. Bell based on experience working with him through dozens of cases." *Id.* at 69–70. The court sustained the State's objection to further questions exploring their working relationship and their agreements in past cases. *Id.* at 71.

Next, Blair attempted to offer evidence of similar conduct by Bell in *Missouri v. Patterson*, 618 S.W.2d 664 (Mo.1981) (en banc). In *Patterson*, Bell had agreed to drop burglary charges against the State's chief witness, Woodcox, but refused to disclose the deal to the defense. The court sustained the State's objection to the introduction of the Missouri Supreme Court opinion in *Patterson*, reversing the conviction for Bell's failure to disclose the agreement, and sustained objections to Woodcox's testimony about his dealings with Bell. 27.26 transcript at 75, 119–20. Sterling, it turns out, represented Patterson in that case and later represented Woodcox in his burglary case. *Id.* at 75, 77. The court sustained the State's objection to the cross-examination of Sterling with respect to his dealings with Bell in the *Patterson* case. *Id.* at 76. The court also excluded testimo-

ny from Blair's trial lawyer, who had cross-examined Jones, on how knowledge of the deal would have affected his strategy, questioning, and presentation. *Id.* at 94–95. The State called Jones, who testified that he had never discussed with Sterling or Bell exchanging his testimony for leniency. *Id.* at 160.

The state court found that it was not until after Blair's trial that Bell entered into a specific plea agreement with Jones' lawyer setting forth the number of years of probation Jones would receive. *Blair v. Missouri*, No. CV83–6637, 27.26 Order at 3 (Mo.Cir.Ct. July 7, 1983). The court found that no deals were made in this case and that there was no prejudice. *Id.* at 9–11. The Missouri Court of Appeals accepted this conclusion. *Blair v. State*, No. WD 35053, Mem.Op. at 2–4 (July 31, 1984).

The federal district court did not adopt or reject the state court fact finding, noting that Jones' testimony that he was unaware of any leniency promises was contradicted by the sworn statements of Bell and Sterling. 643 F.Supp at 787. Instead the district court decided that, based on the state court record, there was no prejudice. *Id.* at 788. The majority criticizes this approach and does not reach the issue of prejudice. Instead, the majority adopts the state court fact finding and concludes that there was no deal. *Ante* at 1317 n. 7.

### B.

On collateral review, we accord a rebuttable presumption of correctness to state court factual determinations. 28 U.S.C. § 2254(d) (1982). We do not accord this presumption to a state court's legal rulings or to state court conclusions on mixed questions of law and fact. *Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982) (per curiam). We also do not accord a presumption of correctness to state findings where the material facts were not adequately developed at the state court hearing; where the applicant did not receive a full, fair, and adequate state hearing; or where the findings

are not supported by the record. 28 U.S.C. § 2254(d)(3), (d)(6), (d)(8).

We should not accept the state findings in this case. First, the finding that there was no deal is a mixed question of law and fact. It requires a legal conclusion as to what constitutes a "deal" which must be disclosed to the defense. Second, the evidentiary rulings at Blair's post-conviction hearing deprived him of a full and fair hearing, and crucial state findings are not supported by the record. The evidence supports the view that Bell deliberately conducted his negotiations with a wink and a nod in order to avoid damaging impeachment.

Initially, I accept the majority's description of the difference between fact questions and mixed questions of law and fact. Fact-finding involves *deciding which events will occur or have transpired in the past*, while "[m]ixed questions involve 'the application of legal principles to the historical facts of [a] case. . . .'" *Ante* at 1318 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 342, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980)). In this case, the state post-conviction court's finding that there was no deal rests on its erroneous view that a deal must be a finalized and specific agreement between the prosecution and a witness before it must be disclosed to the defense. 27.26 transcript at 64–65 (rejecting notion of a tacit agreement).

The state is usually in a far better position than a defendant to collect evidence. Because the state's primary interest is in justice, not convictions, it must disclose material evidence favorable to the defense. In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the prosecution withheld a statement by Brady's companion wherein he confessed to the killing for which they were both separately tried. The Supreme Court elaborated on the prosecutorial disclosure required by the due process of law. "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith

of the prosecution." *Id.* at 87, 83 S.Ct. at 1196. The state must disclose material evidence tending to impeach any of its own witnesses. *Giglio v. United States*, 405 U.S. 150, 154–55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *United States v. Librach*, 520 F.2d 550, 553 (8th Cir.1975) (concealment of payments made to witness); *accord United States v. Kiszewski*, 877 F.2d 210, 215–16 (2d Cir.1989); *United States v. Shaffer*, 789 F.2d 682, 687–89 (9th Cir.1986); *see also* Mo.R.Crim.Pro. 25.-03(A)(9) (disclosure required of any information which tends to negate the guilt of the defendant or mitigate the degree of the offense charged).

*Giglio* and its progeny firmly establish that even leniency promises must be disclosed, because such promises provide a strong motive for witnesses to testify according to government expectations. In *Giglio*, the government's witness testified that he had not been promised leniency in exchange for his testimony. The United States Attorney who tried the case, however, told the witness that he would definitely be prosecuted if he did not testify and that if he did testify, the witness would be obliged to rely on the good judgment of the Government. *Giglio*, 405 U.S. at 152–53, 92 S.Ct. at 765–66. The Court reversed Giglio's conviction for the failure to disclose leniency promises made by the United States Attorney and by an assistant, noting that even the statement by the United States Attorney supported the existence of a leniency agreement. *Id.* n. 4. *See also Napue v. Illinois*, 360 U.S. 264, 267–68, 79 S.Ct. 1173, 1176, 3 L.Ed.2d 1217 (1959) (holding that the prosecution should have disclosed promise of some reduction in sentence for favorable testimony). In *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the prosecution promised two witnesses payment if it was satisfied with their testimony. The Supreme Court held that the promises should have been disclosed even though the money was not "guaranteed."

The fact that the stake was not guaranteed through a promise or binding contract, but was expressly contingent on the Government's satisfaction with the

end result, served only to strengthen any incentive to testify falsely in order to secure a conviction. Moreover, the prosecutor disclosed affidavits that stated that O'Connor and Mitchell received no promises of reward.... [T]he natural effect of these affidavits would be [to] mislead....

*Id.* at 683–84, 105 S.Ct. at 3384. These Supreme Court opinions have been repeatedly understood to require disclosure of leniency inducements strong enough to motivate false testimony.[5] It was well established at the time of trial that prosecutors could not avoid disclosure by softening the edges of their promises with some vagueness.[6]

In light of these cases, it is clear that the state courts misunderstood the prosecution's disclosure responsibility. There was an understanding between the parties that should have been disclosed, even if the probation terms were left unspecified. Bell admits, and the majority concedes, that he made promises of leniency to Jones in exchange for his testimony against Blair. *Ante* at 1319; *Missouri v. Jones,* sentencing transcript at 4. The state courts made no finding to the contrary.

The record also shows that the prosecutor intentionally elicited perjury to bolster Jones' credibility. At trial, Bell asked Jones if he had made any deals with respect to these charges and Jones said no. Moreover, Bell told the court and the defense attorneys that "[n]o deals have been expressly or impliedly made with him concerning those charges." Trial transcript, vol. 1 at 348. At Jones' sentencing hearing, however, Bell admitted to promising Jones leniency in this case but to deliberately leaving the fine print for later for "tactical reasons" because Jones was still to be called as a witness.[7] This establishes that Bell deliberately deceived the trial court and the defense. Bell wanted to induce Jones to give favorable testimony, and wanted not only to minimize Jones' impeachment, but also to bolster Jones' credibility by having Jones deny that there was a deal.

I would reach the same conclusion even if this issue could somehow be characterized as a question of pure fact. The state post-conviction court made its conclusive determination that there was no deal during the early part of Sterling's testimony in response to an evidentiary objection made by the State. Thereafter, the court excluded relevant evidence depriving Blair of the adequate development of the facts and a full and fair hearing. The state court excluded from its consideration evidence of Bell's practices, Sterling's past dealings with Bell generally and in the *Patterson* case, and Blair's trial attorney's testimony regarding his examination of Jones. *See McBryar v. McElroy,* 510 F.Supp 706, 709 (N.D.Ga.1981) (exclusions of testimony and

---

**5.** The Eleventh Circuit explained:

Certainly *Giglio* does not require that the word "promise" is a word of art that must be specifically employed.... "The thrust of *Giglio* and its progeny has been to ensure that the jury knows the facts that might motivate a witness in giving false testimony ..." ... which testimony "could ... in any reasonable likelihood have affected the judgment of the jury."

*Brown v. Wainwright,* 785 F.2d 1457, 1464–65 (11th Cir.1986) (citations to earlier cases omitted).

**6.** In *Dubose v. Lefevre,* 619 F.2d 973, 977 (2d Cir.1980), the prosecutor admitted that she had told the witness that with her testimony, "a misdemeanor was probably more in the realm of a possibility than a felony." The state court found that there was no deal, and the Second Circuit reversed. *Id.* at 978. "The fact that the promise did not take a specific form did not

allow the prosecution to avoid disclosing [it] to the jury...." *Id.* at 979. Similarly, in *United States v. Butler,* 567 F.2d 885 (9th Cir.1978), two government investigators told the witness that a dismissal or reduction of his pending charges would be a strong probability if he testified. *Id.* at 887. While there was no claim that a "bald promise" was made, the court found the innuendos that "everything would be all right" enough to require disclosure. *Id.* at 888–89. *See also, Campbell v. Reed,* 594 F.2d 4, 6 (4th Cir.1979) ("everything would be all right"); *Washington v. Vincent,* 525 F.2d 262, 265–67 (2d Cir.1975) (prosecutor would "see what [he] could do to help him"), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976).

**7.** *Jones,* sentencing transcript at 4 (quoted *supra* at 1336; *accord* 27.26 transcript at 64 (Sterling's recollection of Bell's motive, understanding "between us.") (quoted *supra* at 1336).

the absence of witnesses led to the absence of a full and fair state hearing). Moreover, the state courts relied on Jones' testimony that he never discussed his pending charges in connection with his testimony against Blair, which was contradicted by both Sterling and Bell. Accordingly, even if I agreed with the majority that this is a fact question, I would nevertheless reject the state courts' fact-finding. Any presumption of correctness has been rebutted in this case.

C.

We must next decide the materiality of the state's knowing use of perjured testimony. The district court found no prejudice but erroneously applied the materiality standard for the simple nondisclosure of evidence. The majority does not decide this issue. I would remand this issue to the district court for application of the materiality test for the knowing use of false testimony set forth in *United States v. Agurs*, 427 U.S. 97, 103–04, 96 S.Ct. 2392, 2397–98, 49 L.Ed.2d 342 (1976).

"[T]he knowing use of perjured testimony involves prosecutorial misconduct and more importantly involves 'a corruption of the truth-seeking function of the trial process.'" *Bagley*, 473 U.S. at 680, 105 S.Ct. at 3382 (plurality) (citing *Agurs*, 427 U.S. at 104, 96 S.Ct. at 2397). Where the State knowingly offers perjured testimony and does not correct it, it is material and prejudicial if there is any reasonable likelihood that it affected the jury's judgment or unless it is "harmless beyond a reasonable doubt." *Id.* (quoting *Agurs*, 427 U.S. at 103–04, 96 S.Ct. at 2397–98). While *Bagley* altered the prejudice test for the simple nondisclosure of favorable evidence by holding that any nondisclosed evidence is

material only where it undermines confidence in the outcome, *Bagley* did not reconsider the standard for cases involving false testimony. *United States v. Foster*, 874 F.2d 491, 494–95 (8th Cir.1988) (false testimony); *Brown v. Wainwright*, 785 F.2d at 1465–66.

While there is little doubt in my mind that the knowing use of Jones' false testimony was material in this case, the appropriate action is to remand this matter to the district court for a full evidentiary hearing and application of the harmless beyond a reasonable doubt standard.

There clearly is sufficient evidence to warrant a remand. The jury did not know that the State and Jones had made a deal under which Jones was to be given probation for offenses for which he could have been imprisoned for twenty years or more. This evidence certainly was of greater materiality than the evidence that Jones pawned the ring; that his probation, which had only a few months left, was not revoked; or that he had received a reward for turning in Blair.[8] *See Brown v. Wainwright*, 785 F.2d at 1459, 1466 (this evidence not cumulative with other impeachment evidence because it involves new facts not known by the jury from any other evidence).

The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend....

Had the jury been apprised of the true facts, however, it might well have concluded that Hamer had fabricated testimony in order to curry the favor of the very State who was prosecuting the case

---

**8.** The defense also attempted to impeach Sharon Jones by showing inconsistencies in her testimony between her initial statement to the police where she disclaimed knowing the names of the victim or of the man who hired Blair, trial transcript, vol. 4 at 1414–15, and her testimony on the stand that Walter discussed the killing with her the day before and the day of the killing, telling her both names, and showing her the driver's license from which she claimed on the stand to have remembered the victim's

name. *Id.* at 1410–11. Sharon visited Ernest Jones in jail after her first statement to the police and before she testified. *Id.* at 1423–24. She was also the 17–year–old sister of Ernest Jones' girlfriend, Tina Jackson. *Id.* at 1382. She lived with Tina, who bore Ernest Jones children. *Id.* at 1423. She was promised $1,000 for her testimony, $250 up front with $750 to follow after she testified satisfactorily. *Id.* at 1392.

in which Hamer was testifying, for Hamer might have believed that such a representative was in a position to implement (as he ultimately attempted to do) any promise of consideration. *Napue*, 360 U.S. at 270, 79 S.Ct. at 1177; *see also Bagley*, 473 U.S. at 676, 105 S.Ct. at 3380 ("if disclosed and used effectively, it may make the difference between conviction and acquittal."). Finally, the court should also consider the effect of this error on the jury's sentence. Sufficient doubt may have been created in the jurors' minds about the evidence of premeditation that they might have shied away from imposing capital punishment even if that would have been inconsistent with their guilt verdict.[9]

### III.

Next, Blair argues that the trial court's failure to instruct the jury on first-degree murder as an alternative to capital murder, together with subsequent inconsistent decisions of the Missouri Supreme Court addressing this instruction issue, have violated his equal protection and due process rights. Blair argues that his confessions support a conviction for first-degree murder, on a felony-murder theory, for which an instruction should have been given.[10] Instead, the court gave only capital murder, second-degree murder, and manslaughter instructions.

### A.

The Missouri Supreme Court held that Blair was not entitled to a first-degree murder instruction because first-degree murder was not a lesser included offense of capital murder. *State v. Blair*, 638 S.W.2d at 746–47. Blair argues that the Missouri Supreme Court's reasoning in his case is inconsistent with its other decisions on the same issue, violating his equal protection rights. I agree, and begin by reviewing the relevant Missouri statutes and decisions.

1.

Effective January 1, 1979, Mo.Rev.Stat. § 556.046 was amended to define a lesser included offense as (1) an offense whose elements are included in a greater offense, or (2) an offense so defined by statute. At the time of this homicide, August 19, 1979, Missouri law required that in every capital case the jury "ascertain, whether the defendant is guilty of capital murder, murder in the first degree, murder in the second degree, manslaughter, or is not guilty of any offense...." Mo.Ann.Stat. § 565.006.1 (Vernon 1979) (amended 1979). On September 28, 1979, an amendment to this section took effect prohibiting instructions on lesser included offenses of capital murder unless supported by the evidence. *Id.* (repealed 1984).

The Missouri Supreme Court affirmed that first-degree murder was a lesser included offense of capital murder and that first-degree murder instructions should be given where supported by the evidence in two decisions subsequent to this amendment. In *State v. Fuhr*, 626 S.W.2d 379 (Mo.1982), the court found that the jury could have concluded that Fuhr killed his victim while committing a robbery on February 6, 1980. The trial court, however, instructed the jury only on capital murder, murder in the second degree, and manslaughter. The Missouri Supreme Court reversed Fuhr's capital murder conviction for the failure to instruct the jury on first-degree murder. *Id; see also State v. Gardner* 618 S.W.2d 40, 41 (Mo.1981) (failure to give first-degree instruction held to be error for crime committed on August 31, 1978). In *State v. Daugherty*, 631 S.W.2d 637, 645 (Mo.1982), the court held that the giving of a first-degree murder instruction for a crime committed September 29, 1979 was proper as a lesser included offense of capital murder despite the prosecution's failure to charge first-degree murder.

**9.** In this regard, the court would have to consider that the failure to give a first-degree murder instruction may have led the jury to impose a more severe verdict than they otherwise might have.

**10.** Felony murder was the only type of first-degree murder under former Missouri law. Mo. Ann.Stat. § 565.003 (Vernon 1979) (repealed 1984) (including kidnaping as a predicate act).

In *State v. Baker*, 636 S.W.2d 902, 904–05 (Mo.1982) (en banc), *cert. denied*, 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983), the defendant was convicted of a capital murder committed on June 19, 1980. He appealed, arguing that he was entitled to a first-degree murder instruction on the basis of *Gardner*. The court concluded that due to the 1979 statutory change in § 556.046, first-degree murder was no longer a lesser included offense of capital murder. The court reasoned that felony murder required proof of the commission of a felony while capital murder did not, thus the elements of the two offenses were dissimilar. *Id.* at 904. Moreover, under the September 1979 amendment to § 565.006.1, a first-degree murder instruction was no longer required unless supported by the evidence. *Id.* at 905.

Later that same year, the Missouri Supreme Court heard Blair's direct appeal. The court applied *Baker*'s holding that first-degree murder was not a lesser included offense of capital murder and affirmed Blair's conviction. *State v. Blair*, 638 S.W.2d at 746–47. The court did not address whether there was sufficient evidence to support a first-degree instruction.[11]

Similarly, in *State v. Woods*, 639 S.W.2d 818, 819 (Mo.1982), the court applied *Baker* to reject the defendant's claim that he was entitled to a first-degree murder instruction as a lesser included offense of capital murder for a murder committed August 13, 1979. The following year, the Missouri Supreme Court decided *State v. Betts*, 646 S.W.2d 94, 96 (Mo.1983) (en banc). Betts was convicted of capital murder for a homicide committed during a December 2, 1979 robbery. The court rejected his claim that he was entitled to a first-degree murder instruction, citing to § 556.046, *Baker*, *Woods*, and *Blair*. "[I]t is the holding of

these cases that no first degree murder instruction is required in a trial for capital murder committed after January 1, 1979. **Baker was in effect at the time of trial.**" *Id.* at 96 (emphasis added). *Baker* was decided in 1982 and Betts' trial took place in 1980.

Later the same year, in *State v. Goddard*, 649 S.W.2d 882, 884–89 (Mo.) (en banc), *cert. denied*, 464 U.S. 997, 104 S.Ct. 495, 78 L.Ed.2d 689 (1983), the Missouri Supreme Court decided that *Baker* was only prospective. The defendant was convicted of first-degree murder, after being charged and acquitted of capital murder, for a murder and robbery committed in October 1980. He appealed, arguing that it was error to instruct the jury on first-degree murder where he had not been charged with it in light of *Baker* and *Blair*. The Missouri Supreme Court rejected Goddard's claim, holding that the rule announced in *Baker* was to be applied prospectively to trials from the date of that decision. *Id.* at 889. The court did not mention *Blair*, *Woods*, or *Betts*, in each of which the Missouri Supreme Court applied *Baker* to affirm convictions entered *before* *Baker* was decided. Three of the seven judges dissented. They argued that *Baker* could not be only prospective because it purported to apply § 556.046 respecting lesser included offenses which became effective in 1979. *Id.* at 891 (Welliver, J., dissenting); *id.* at 892 (Donnelly, J., dissenting).

Later the same year, the Missouri Supreme Court completely ignored *Goddard* in affirming a capital conviction from a 1981 trial for a crime committed in 1980 in *State v. Williams*, 652 S.W.2d 102, 112 (Mo.1983). (en banc). Williams argued that he was entitled to a first-degree murder instruction, but the Missouri Supreme Court declined his claim, citing *Baker*.[12]

---

**11.** The court also failed to consider the ex post facto problem posed by application of § 565.006.1 through *Baker* to a homicide that preceded the effective date of the amendment to § 565.006.1. Blair alleges that his ex post facto rights thus were violated. In my view, there is no ex post facto violation as long as Missouri allows a first-degree murder instruction where there is sufficient evidence to support one.

**12.** Williams' appeal to our court was decided on narrower grounds. A panel of this court granted Williams' habeas corpus petition because of the uneven application of *Baker*. *Williams v. Armontrout*, 891 F.2d 656, 660 (8th Cir.1989) (vacated). Judge Fagg dissented, arguing that "despite the Missouri Supreme Court's seemingly inconsistent application of its precedents,"

Finally, in *State v. Holland*, 653 S.W.2d 670, 673–74 (Mo.) (en banc) (plurality), the defendant was charged with capital murder and convicted of first-degree murder in a crime committed September 29, 1979. A plurality of the Missouri Supreme Court rejected his claim that the inclusion of a first-degree murder instruction by the trial court was error. Relying on *Goddard*, they noted that *Baker* was only prospective and thus the instruction was permissible at the time of the trial. One judge concurred, reasoning that *Baker* should apply from January 1, 1979, but that instructing down was error only if it was prejudicial. *Id.* at 679 (Rendlen, C.J., concurring). Three judges dissented, arguing that *Baker* had been applied "retroactively or prospectively solely to affirm the conviction before the court at the moment ... a violation of both due process and equal protection.... The majority ... has treated similarly situated defendants differently in a transparent effort to avoid giving them new trials." *Id.* at 679–80 (Welliver, J., dissenting).

### 2.

Equal protection of the law requires that all people similarly situated be treated alike, absent a legitimate government interest expressed in a rational manner. *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Judicial decisions are judged by their consistency and state courts must abide by their constructions of their own law. *Godfrey v. Georgia*, 446 U.S. 420, 432, 100 S.Ct. 1759, 1767, 64 L.Ed.2d 398 (1980).

The Missouri decisions are inconsistent. Despite the passage of § 556.046 and the amendment of § 565.006.1, the Missouri Supreme Court recognized first-degree murder as a lesser included offense of capital murder in two subsequent decisions,

*Fuhr* and *Daugherty*. In *Baker*, the court reversed itself and declared that first-degree murder was not a lesser included offense of capital murder. *Baker* was then applied retroactively in *Blair*, *Woods*, and *Betts*. In *Goddard*, the court changed course and announced that *Baker* was only prospective, declining to apply it in Goddard's case. Next, the court applied *Baker* retroactively in *Williams*. Finally, the court refused to apply *Baker* in *Holland* because *Baker* was only prospective. *See Rumble v. State*, 741 S.W.2d 283, 284 n. 2 (Mo.Ct.App.1987) (these decisions cannot be reconciled).

By shifting back and forth between prospective and retrospective application of *Baker*, the Missouri Supreme Court managed to affirm the conviction in every one of these cases beginning with *Daugherty*. This inconsistent application of the law treated similarly situated defendants differently, and unless there is a reasonable explanation for the inconsistency, Blair's equal protection rights were violated. "Blair's trial occurred before *Baker* was decided, and thus, under *Goddard*, Blair should have received an instruction on first degree murder." *Holland*, 653 S.W.2d at 681 n. 1 (Welliver, J., dissenting).

Missouri argues on appeal that there is no equal protection violation because "... the Missouri Supreme Court was free to draw the line in applying the new law at whatever point it concluded to be most consistent with judicial economy.... The court reasonably decided ... that all appellate decisions after *Baker* would be held to the *Baker* ruling." Brief of Respondent at 37.

I agree that the Missouri Supreme Court may decide whether its decisions will be prospective or retrospective. *See Linkletter v. Walker*, 381 U.S. 618, 629, 85 S.Ct.

---

there was insufficient evidence to support a felony murder instruction. *Id.* at 666 (Fagg, J., dissenting). This court en banc adopted Judge Fagg's view of the facts that the kidnapping was merely incidental to the planned homicide. *Williams v. Armontrout*, 912 F.2d 924, 929 (8th Cir.1990) (en banc). While that is also the State's theory in this case, on its facts, *Williams* is distinguishable because the State's evidence of

premeditation and intent was overwhelming in that case, including the commission of a previous murder with the same motive. *Id.* at 929. Blair's confessions admitted by the State together with the unreliability of the State's witnesses make this a closer case, in which the jury could have believed that kidnapping was the primary scheme of the defendant.

1731, 1737, 14 L.Ed.2d 601 (1965). Perhaps this remains true even where a statute is at issue and the effect of the court's decision is to alter the statute's effective date. But this argument fails to come to grips with the problem posed by these cases. While the Missouri Supreme Court certainly can make *Baker* prospective, it cannot apply its decision on the applicability of *Baker* inconsistently. That is precisely what it has done in violation of principles of equal justice and neutral decision making. If *Baker* applied to every case after the 1979 change in the statutory law, the court would have had to reverse the convictions in *Goddard* and *Holland* and recall the affirmance in *Daugherty*. If *Baker* applied only prospectively to future trials, the analysis used in affirming the conviction in *Williams* was wrong, and the affirmances in *Blair, Woods,* and *Betts* should have been recalled.

In defending Blair's conviction, the majority takes a different approach from the State. The majority concludes that the court's decisions are defensible because in some cases, a first-degree murder instruction was given without notice, such as *Goddard* and *Holland.* In other cases, the defendant wanted a first-degree instruction and was refused, such as *Baker, Blair, Woods, Betts,* and *Williams.* In the majority's view, the first line of cases implicates due process notice requirements, and thus different treatment of those situations was justified. *Ante* at 1328–1330. The distinction recognized by the majority in the fact patterns of these cases is real, but our inquiry must focus on whether or not the legal analysis of the Missouri Supreme Court in these cases is distinguishable. It is not, and the majority has confused what were two separate legal issues in *Goddard* and *Holland.*

The Missouri Supreme Court faced two separate challenges to the first-degree murder instructions given in *Goddard* and *Holland:* whether the first-degree instruction violated *Baker*'s holding that first-degree murder was not a lesser included offense of capital murder, *Holland,* 653 S.W.2d at 673, *Goddard,* 649 S.W.2d at 887; and whether the defendants' rights to no-

tice of the charges against them was violated when they were convicted of first-degree murder although not charged with it. *Holland,* 653 S.W.2d at 673; *Goddard,* 649 S.W.2d at 889. The court answered the first claim by saying that *Baker* was only prospective. It answered the notice argument by saying that because the crimes were committed prior to *Baker,* there was no prejudice from the failure to charge first-degree murder because the defendants had notice from *Fuhr* and *Daugherty* that the court could instruct down. *Holland,* 653 S.W.2d at 673–74; *Goddard,* 649 S.W.2d at 887, 889.

While the majority is correct that the second challenge regarding notice was never made in *Baker, Blair, Woods, Betts,* or *Williams,* this sheds no light whatsoever on whether the Missouri Supreme Court's decisions on the first issue are inconsistent. In *Fuhr,* the court held that first-degree murder was a lesser included offense for a crime committed in 1980. *Baker* held that first-degree murder was not a lesser included offense of capital murder. In *Woods,* the court said that *Baker* applied to every murder committed after January 1, 1979. *Woods,* 639 S.W.2d at 96. *Goddard* held that *Baker* applied only after *Baker*'s publication in 1982. *Goddard,* 649 S.W.2d at 889. In *Williams* the court applied *Baker* retroactive and ignored *Goddard.* These deliberate changes in the effective date of *Baker* and of § 556.046 have nothing to do with the notice problems in *Goddard* and *Holland.* Even if the court had held that *Baker* was retroactive in *Goddard* and *Holland,* it still could have rejected the notice claim on the basis of *Fuhr* and *Daugherty.* The unique benefit of concluding that *Baker* was prospective was that the court did not have to agree with Goddard and Holland's first challenge to the instruction, that first-degree murder was not a lesser included offense at the time of their trials.

Moreover, the Missouri Supreme Court has been inconsistent in its analysis of the notice issue. In *Blair,* the court rejected his request for a first-degree instruction for the additional reason that Blair had not

been charged with first-degree murder. "[I]t would have been error for the trial court to have instructed on first degree murder.... This is because due process requires that a defendant may not be convicted of an offense not charged in the information or indictment." *State v. Blair*, 638 S.W.2d at 747. Yet in *Goddard* and *Holland*, the court rejected this very reasoning and held that it was not error to give the jury a first-degree murder instruction although the defendants had not been charged with first-degree murder. *Holland*, 653 S.W.2d at 674; *Goddard*, 649 S.W.2d at 889. While only one issue is before us, the Missouri Supreme Court has been inconsistent on both.

Finally, I note that Missouri has not been faithful to *Baker* in an important respect. Under § 556.046, first-degree murder instructions were still required where supported by the evidence even though not charged in the indictment. Yet in Blair's case, the court never reviewed the sufficiency of the evidence. Instead, the court applied *Baker* as if *Baker* created the inflexible rule that first degree could never be a lesser included offense of capital murder. *See Blair*, 638 S.W.2d at 746–47.

### B.

Blair was also entitled to a first-degree murder instruction on due process grounds, because there was sufficient evidence to support such an instruction. There was no state finding to the contrary.[13]

*Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), and its progeny establish that the failure to give the jury meaningful choices in its verdict consistent with the evidence violates a defendant's due process rights. In *Beck*, the defendant confessed to entering the vic-

tim's home with an accomplice to commit a robbery. He claimed that he intended to tie up the victim, but his accomplice struck the man and killed him. The jury was instructed only on capital murder and convicted the defendant, sentencing him to death. *Id.* at 629–30, 100 S.Ct. at 2385–86. The Court reversed, reasoning that the inclusion of lesser offense instructions is necessary to insure "that the jury will accord the defendant the full benefit of the reasonable-doubt standard" where the defendant is clearly guilty of some offense, but where doubt may exist as to an element of the highest offense charged. *Id.* at 633–34, 100 S.Ct. at 2387–88 (citing *Keeble v. United States*, 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844 (1973)).[14] The Court rejected Alabama's argument that the option of a mistrial provided adequate due process protection against improper verdicts. *Id.* at 644, 100 S.Ct. at 2393. The Court distinguished *Beck* in *Hopper v. Evans*, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982), where, under the same Alabama law, the defendant did not receive a lesser offense instruction in a capital case. The defendant confessed to intentionally killing his victim and requested the death penalty. *Id.* at 607–08, 102 S.Ct. at 2050–51. The Court affirmed his conviction because there was no evidence to support a conviction for any lesser offense, stressing that *Beck* required other instructions only when supported by the evidence. *Id.* at 610, 102 S.Ct. at 2052. Similarly, in *Spaziano v. Florida*, 468 U.S. 447, 455, 104 S.Ct. 3154, 3159, 82 L.Ed.2d 340 (1984), the Court rejected the view that *Beck* always required lesser included offense instructions in every case, where a conviction for the lesser offense was unavailable because of the statute of limitations.

---

**13.** The majority argues that the trial court found that there was insufficient evidence of kidnapping. *Ante* at 1330 n. 23. I find no such finding in the record. Nor can I find any finding from any other state court that there was inadequate evidence to support a first-degree murder instruction. The Missouri Supreme Court decided that Blair was not entitled to a first-degree instruction solely on the basis of *Baker*, without considering that even under *Baker* a defendant was entitled to a first-degree murder instruction

if the evidence supported it. *Blair*, 638 S.W.2d at 746–47. The presumption of correctness accorded state fact findings does not extend to factual issues left unresolved. 28 U.S.C. § 2254(d)(1).

**14.** This requirement also protects the prosecution by increasing the chances that the defendant will be convicted of some offense. *Beck*, 447 U.S. at 633, 100 S.Ct. at 2387.

The majority interprets *Beck* and its progeny to require merely that sometimes the jury have a "third option" in addition to conviction or acquittal. *Ante* at 1326. Because Blair's jury received second-degree murder and manslaughter instructions, the majority finds no due process violation. *Id.* It does not suffice, however, to give second-degree murder or manslaughter instructions when there is no support for giving the instructions in the record. Where the alternative instructions do not correspond to the evidence, they are of no more benefit in avoiding the jury's dilemma than the possibility of a mistrial. *Cf. Spaziano*, 468 U.S. at 455–56, 104 S.Ct. at 3159–60 ("Requiring that the jury be instructed on lesser included offenses for which the defendant may not be convicted, however, would simply introduce another type of distortion into the fact-finding process."). Nor would giving the jury a second-degree murder or manslaughter instruction be sufficient even if they are supported by the evidence, if the evidence also supports a first-degree murder instruction. Due process requires that a jury be given all the meaningful verdict options supported by the evidence. *Spaziano*, 468 U.S. at 455, 104 S.Ct. at 3159; *Hopper*, 456 U.S. at 610, 102 S.Ct. at 2052; *Beck*, 447 U.S. at 636, 100 S.Ct. at 2389.

Accordingly, we must decide if the evidence supported a first-degree murder instruction. Under Missouri law, there is sufficient evidence to support an instruction where the jury could reasonably find the elements of the offense on the basis of the evidence submitted. *Daugherty*, 631 S.W.2d at 639; *Fuhr*, 626 S.W.2d at 379. ("Instructions must be supported by substantial evidence and reasonable inferences to be drawn therefrom."). First-degree murder under Missouri law was a homicide committed in the course of enumerated felonies without premeditated intent. Mo. Ann.Code § 565.003 (Vernon 1979) (repealed 1984).

The victim's boyfriend testified that Blair told him when Blair kidnapped the victim that he was not going to harm her. Trial transcript, vol. 4 at 1079. Blair left the boyfriend unharmed, and told the boy-friend, as he left with the victim in her car, that he was not going to tie the boyfriend up or rip out the phone. *Id.* at 1088. Blair's confessions recited that he told the victim in the car that he was going to hold her for a few days to prevent her from testifying. *Id.*, vol. 6 at 1980; video statement at 24. When they exited the car, she tried to escape and he killed her. *Id.* at 25. The State introduced these confessions as evidence of Blair's guilt but argued that, in fact, he had always intended to kill her, relying on Jones' testimony. The physical evidence established only that Blair was at the victim's apartment and at the scene of the murder. The forensic testimony indicated that she was killed at close range. In light of the impeachment that was made of the State's witnesses (and could have been even more effectively but for the perjured testimony), the jury could have reasonably decided to credit the confessions fully. *Compare Gardner*, 618 S.W.2d at 41 (first-degree murder instruction required where defendant kidnapped and raped the victim, then had her killed without provocation). Moreover, the trial court did give second-degree murder and manslaughter instructions. If there was sufficient evidence to support these instructions, there was sufficient evidence to believe that the killing was not premeditated and that kidnapping was the original plan. Accordingly, there was sufficient evidence to support a first-degree murder instruction. Such an instruction might have recited that Blair was guilty of first-degree murder if the jury found that Blair shot and killed her, that he did so in the course of a kidnapping, and that he did so to prevent detection of the kidnapping or to prevent the escape of the victim. The penalty for first-degree murder at the time of Blair's trial was life imprisonment. Mo. Ann.Stat. § 565.008.2 (Vernon 1979) (repealed 1984).

Had the jury credited the confessions, it might not have found that the crime was adequately defined by the second-degree murder instruction. Second-degree murder was defined as all other kinds of murder, including reckless killings, murder in the

heat of passion, and homicides committed during crimes other than those listed as predicates for first-degree murder. Mo. Ann.Stat. § 565.004 (Vernon 1979) (repealed 1984). Second-degree murder was punishable by not less than ten years in prison. Mo.Ann.Stat § 565.008.2 (Vernon 1979) (repealed 1984). The jury was instructed that they could find second-degree murder if they found that Blair caused the victim's death by shooting her, that he intended to shoot her, and that he did not do so in fear of her actions. Instruction 8. There was no reference to the kidnapping or to the attempt to prevent her from testifying. This instruction did not capture the idea that the killing occurred in furtherance of another crime or that Blair killed her to prevent detection or escape.

If a juror had reasonable doubts about the State's evidence of premeditation, but believed that Blair killed her in the course of a kidnapping, there was no appropriate verdict that described this conduct. The second-degree instruction failed to describe a criminal purpose for the killing, and the capital instruction required premeditation that preceded the kidnapping. In this case, due process required that the jury be given the option of choosing first-degree murder consistent with the confessions. It is not necessary, nor does Blair request, that every lesser included offense of murder have an instruction in every case.

## IV.

Finally, I agree with Blair that the prosecution's closing argument at the penalty stage was improper and prejudicial.

The initial jury panel of ninety-seven had seventeen African–American jurors. Twelve were excluded because of their reservations about the death penalty. One knew the defendant. The last four were struck by the prosecution. Trial transcript, vol. 6 at 1986. The jury, drawn from Kansas City, was thus all white. In his closing statement at the penalty phase, the prose-

cutor focused on the personal characteristics of the white victim and the race of the defendant. He told the jury:

> I want to talk with you for just a few minutes about the two principal actors in this case. Kathy Jo Allen, an attractive, 21–year–old girl, striving to be an artist, going to the Kansas City Art Institute, working part time to help support herself and pay for her education. And she was viciously raped while in the supposed safety of her own home last April, as we all heard. She was nearly killed in that rape, but she had the courage to come forward. . . .

> Then, again, the supposed safety of her own home was invaded by this defendant, Walter Junior Blair. Can you imagine her state of mind when she woke up at 6 o'clock that morning, staring into the muzzle of a gun held by this black man?

Trial transcript, vol. 7 at 2314–15. After reviewing the crime, the prosecutor explained that the jury could choose execution or life imprisonment for fifty years. The prosecutor's first argument for choosing between them was: "Why should we as taxpayers have to house this man for fifty years? Why should we have to feed him three meals a day for fifty years, clothe him for fifty years, furnish him recreation, medical care?" *Id.* at 2317. The prosecutor then immediately made negative reference to Blair's assertion of his constitutional rights during trial.[15]

In three respects, the prosecutor's closing argument violated the rule that the sentencing decision focus on the characteristics of the defendant and the circumstances of the crime. First, the prosecution's "taxpayer" argument was designed to inflame the jury and was unrelated to the personal characteristics of the defendant. It also relied on facts not in evidence. Next, the prosecution is not permitted to make adverse comment on the defendant's assertion of his constitutional rights.

---

**15.** "I submit to you, and we've heard a lot about constitutional rights in this case, the constitutional rights of this defendant, and certainly he's been afforded every constitutional right there is, including representation by two of the finest criminal lawyers here in Jackson County. . . ." Trial transcript, vol. 7 at 2318.

Finally, the prosecutor impermissibly focused the all-white jury's attention on the race of the defendant. Each of these prejudicial arguments violated constitutional principles clearly established before Blair's conviction became final.[16]

### A.

The Supreme Court has time and again declared that the eighth amendment prohibits arbitrariness in the imposition of the death penalty and that sufficient reliability can be attained only through the jury's individualized consideration of the defendant. Individualized consideration has long meant a focus on the characteristics of the offender and the circumstances of the offense, together with an avoidance of arguments that play upon undifferentiated fears of the jury. "[W]e cannot avoid the conclusion that an individualized decision is essential in capital cases. [Each defendant is entitled to] that degree of respect due the individual. [I]ndividualized consideration [is] a constitutional requirement in imposing the death sentence." *Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978) (plurality opinion of Burger, J.); *accord Zant v. Stephens,* 462 U.S. 862, 879, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1982) (collecting cases); *Pennsylvania v. Ashe,* 302 U.S. 51, 55, 58 S.Ct. 59, 60, 82 L.Ed. 43 (1937). In reviewing death sentences, the Supreme Court has acted to "ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." *Eddings v. Oklahoma,* 455 U.S. 104, 118, 102 S.Ct. 869, 878, 71 L.Ed.2d 1 (1982) (O'Connor, J., concurring). All the evidence submitted to the jury during sentencing must have "some bearing on the defendant's 'personal responsibility and moral guilt.'" *Booth v. Maryland,* 482 U.S. 496, 502, 107 S.Ct. 2529, 2532, 96 L.Ed.2d 440 (1987) (quoting *Enmund v. Florida,* 458 U.S. 782, 801, 102 S.Ct. 3368, 3379, 73 L.Ed.2d 1140 (1982)).

The majority concedes that the prosecutor's argument that Blair should be put to death rather than imprisoned at the public's expense violated Blair's eighth amendment rights by deflecting focus from the crime and the defendant. *Ante* at 1322, 1323 (citing *Zant* ). The prosecutor's argument was improper because it included generalized and inflammatory sentiments about incarceration that have little to do with the propriety of selecting Walter Blair in particular for death. *Zant,* 462 U.S. at 879, 103 S.Ct. at 2744; *see State v. Muskus,* 158 Ohio St. 276, 109 N.E.2d 15 (1952) (taxpayer argument violates the Constitution).[17] Cost is not accepted as a constitutional justification for the death penalty. *Gregg v. Georgia,* 428 U.S. 153, 183–87, 96 S.Ct. 2909, 2929–31, 49 L.Ed.2d 859 (1976). The prosecutor's subsequent statement, pointing out that Blair was represented by counsel and had fully asserted his rights, buttressed his costs argument and adversely commented on Blair's assertion of his rights. *See, e.g., Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (adverse comment prohibited).

The majority insists, however, that despite having used eighth amendment standards to determine the propriety of the argument, we cannot use eighth amendment standards to judge the legal consequence of the prosecutor's argument. *Ante* at 1323. Instead, it employs the weaker due process standard described in *Newlon v. Armontrout,* 885 F.2d 1328,

---

**16.** *See Sawyer v. Smith,* — U.S. ——, ——, 110 S.Ct. 2822, 2826, 111 L.Ed.2d 193 (1990) (application of retroactivity rule of *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), to capital sentencing errors). *Sawyer* establishes that constitutional condemnation of the prosecutor's closing argument must precede the conviction's finality to be applied on collateral review. Subsequent cases can nevertheless inform our understanding of prior law, the interplay between the various clauses of the Constitution, and the legal consequences of the error. No state procedural bar on these claims was invoked by the state courts. *See Ulster County Court v. Allen,* 442 U.S. 140, 152–53, 99 S.Ct. 2213, 2222–23, 60 L.Ed.2d 777 (1979).

**17.** *See also State v. Jordan,* 80 Ariz. 193, 294 P.2d 677 (1956); *Commonwealth v. Clark,* 322 Pa. 321 185 A. 764 (1936) (condemning taxpayer argument).

1336–37 (8th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990). There is a substantial difference between the two legal standards. Under the eighth amendment, we must decide if the type of statement made at sentencing is "inconsistent with the reasoned decision-making we require." *Booth,* 482 U.S. at 508–09, 107 S.Ct. at 2536 ("the formal presentation of this information by the state can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence."). Instead, the majority would place the burden on the defendant to prove that the prosecutor's deliberate misconduct made the entire sentencing proceeding unfair and, absent the error, the outcome would have been different. *Ante* at 1324. This places the risk of our uncertainty as to the jury's thinking on the defendant. It also risks continuing intentional misconduct by prosecutors. I disagree with the majority's analysis, and I believe that it is unsupported.

The eighth amendment governs not only the permissible scope of the penalty proceeding, it also provides the consequences for errors during the penalty proceeding. Three recent Supreme Court decisions have evaluated the legal effect of closing arguments at the penalty phase under the eighth amendment. *South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 2210, 104 L.Ed.2d 876, 882 (1989); *Booth,* 482 U.S. at 501–03, 107 S.Ct. at 2532–33; *Caldwell v. Mississippi,* 472 U.S. 320, 329–30, 105 S.Ct. 2633, 2639–40, 86 L.Ed.2d 231 (1985). The majority focuses on only *Caldwell.* Comparing *Caldwell* with *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (due process standards applied to prosecutorial statements at guilt phase), the majority concludes that the eighth amendment determines the legal consequences of a misstatement only where the statement misleads the jury into thinking that they are not ultimately responsible for imposing the death penalty. *Ante* at 1323–1324. The majority neglects to consider that *Gathers* and *Booth* also

applied the eighth amendment to errors that did *not* mislead the jury as to its role in the sentencing process. In *Booth,* the Court held that the use of victim impact statements was unconstitutional under eighth amendment standards. 482 U.S. at 508–09, 107 S.Ct. at 2535–36. The Court did not shift the onerous burden of proof proposed by the majority onto the defendant to prove the effect of the error on the jury's thinking. Instead, the Court reversed Booth's sentence, concluding that the type of error at issue "creates an impermissible risk that the capital sentencing decision will be made in an arbitrary manner." *Id.* at 505, 107 S.Ct. at 2534. Similarly, in *Gathers,* the Court reversed a conviction on eighth amendment grounds where the prosecutor read from a religious tract the victim happened to be carrying at the time of his death. 490 U.S. at —— – ——, 109 S.Ct. at 2210–11, 104 L.Ed.2d at 882–83.[18] In neither case did the error mislead the jury as to its role.

The due process clause, rather than the eighth amendment, controls the content of prosecutorial statements made at the guilt phase. *Darden,* 477 U.S. at 178–82, 106 S.Ct. at 2470–72. This court's opinion in *Newlon,* relied upon by the majority, properly noted that in considering a closing argument at the penalty stage, both clauses of the Constitution must be considered.

> We cannot agree with the State's argument that the district court's use of both eighth amendment and fourteenth amendment analysis somehow renders its decision improper. Rather, we find that the eighth amendment analysis bolstered the district court's finding of a due process violation. As the Tenth Circuit has stated, "[a] decision on the propriety of a closing argument must look to the Eighth Amendment's command that a death sentence be based on a complete assessment of the defendant's individual circumstances...."

*Newlon,* 885 F.2d at 1337 (quoting *Coleman v. Brown,* 802 F.2d 1227, 1239 (10th

---

**18.** *Gathers* also rules out the possibility that eighth amendment analysis applies only to formal procedures that are misleading.

Cir.1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987)).

The impropriety of the standard urged by the majority, that Blair prove that the jury would not have given him the death penalty absent the improper argument, is further demonstrated by the type of judgment that must be made in a capital case. It is difficult, if not impossible, in any type of case for us to be certain which factors influenced a jury's verdict. We do not know the individual jurors. We do not know what went through their minds as each heard the arguments of counsel. We are nevertheless frequently called upon to assess what effect more or less evidence would have had on a jury's deliberations with respect to a civil verdict or a defendant's guilt or innocence. We review the evidence and arguments and weigh the probable effect of additions and subtractions. We decide whether there was more than enough evidence of guilt. There are sometimes hard cases, but our review of the sufficiency of the evidence in many cases is not prohibitively difficult because we must decide only how a reasonable juror would view the evidence.

These difficulties are compounded, however, when we are called upon to decide why twelve individuals decided to impose the death penalty. We are not reviewing the sufficiency of tangible evidence. "[A] wider range of considerations enters into" this judgment. *Zant,* 462 U.S. at 883, 103 S.Ct. at 2746. In no other decision are the individual cultural differences among jurors more apparent. In no other type of judgment are the influential factors so likely to be personal, unstated, and at times unrelated to the particular evidence. We do not know how many jurors thought this was a close case before finally voting for capital punishment. We can never be sure that the stated aggravating factors were the decisive ones; nor are we entitled to presume that they were. While the aggravating circumstances considered by the

jury are seemingly substantial in differentiating between murderers, we know that a prosecutor's appeals to public prejudices are also powerful. Even in the face of aggravating circumstances, we must not underestimate the effect of these prejudices—prejudices proscribed from the jury's consideration by law, but summoned into Blair's hearing by this prosecutor.

Under eighth amendment standards, the prosecution's argument regarding incarceration expense and the defendant's constitutional rights was prejudicial. These arguments introduce a real danger of arbitrariness into sentencing hearings and are inconsistent with the type of decision making required. Blair recites polling information that the cost of incarceration is a significant reason why many people in this country support the death penalty. Appellant's Brief at 30. Moreover, many citizens have never visited a prison and mistakenly believe that criminals are coddled. In light of the prejudice these types of argument evoke, Blair need not assume the impossible task of *proving* that this jury would have reached a different conclusion absent this argument. We are unable to know what the jury would have done, and Blair should not bear the risk of our uncertainty. "[A]n appellate court ... is wholly ill-suited to evaluate the appropriateness of death in the first instance. Whatever intangibles the jury might consider in its sentencing determination, few can be gleaned from an appellate record." *Caldwell v. Mississippi,* 472 U.S. at 330, 105 S.Ct. at 2640.[19] Because "the penalty of death is qualitatively different from a sentence of imprisonment ... there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. State of North Carolina,* 428 U.S. 280 at 305, 96 S.Ct. 2978 at 2991, 49 L.Ed.2d 944 (1976) (plurality); *accord Zant,* 462 U.S. at 884–85, 103 S.Ct. at 2746–47;[20] *Eddings,* 455 U.S. at 117, 102 S.Ct. at 878 (O'Connor, J., concurring).

**19.** *Clemons v. Mississippi,* —— U.S. ——, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), in contrast, did not involve prosecutorial misconduct or appeals to social prejudice. The effect of social prejudice is the most difficult factor for appellate courts to judge.

**20.** This is not a case like *Zant,* in which the error involved evidence that did relate to the

### B.

The prosecutor also introduced racial prejudice into the sentencing process by discussing the race of the defendant and speculating on the victim's fear at seeing "this black man" with a gun.[21] His argument carefully played upon white fear of crime and the tendency of white people to associate crime with blacks. This is an exceedingly powerful image in our society. It is perpetrated by the media and perpetuated by manipulative politicians. It leads white people to cross the street when they see an African–American coming and to speed up when they walk nearby. It reinforces racial stereotypes that reverberate in employment decisions, housing decisions, and in the minds of African–Americans who feel that they will never live to see a better day in this country.

Race plays an especially influential role in capital sentencing decisions. In *McCleskey v. Kemp*, 481 U.S. 279, 286, 107 S.Ct. 1756, 1763, 95 L.Ed.2d 262 (1987), the defendant introduced evidence that "the death penalty was assessed in 22% of the cases involving black defendants and white victims; [and] 8% of cases involving white defendants and white victims." The Court rejected the defendant's fourteenth amendment equal protection claim only because he was unable to produce any indicia that race was a factor in his own case. *Id.* at 292–93, 107 S.Ct. at 1766–67. The Court did not refute the claim that even without any direct comment on race, juries are three times likelier to impose the death penalty on a black who kills a white as they are to give the same penalty to a white defendant.

In this case, the prosecution did explicitly comment on the defendant's race, massaging the conscious and subconscious thoughts of the jury. It does not take much to summon such a powerful image. Indeed, the effectiveness of his appeal might have been compromised had it been more forthright. Moreover, while *Batson* challenges to a prosecutor's use of peremptory strikes against black jurors cannot be made retroactively,[22] the prosecution's exclusion of all of the qualified black jurors in this case is strong circumstantial evidence of discriminatory purpose. *See Batson v. Kentucky*, 476 U.S. 79, 93–94, 106 S.Ct. 1712, 1721–22, 90 L.Ed.2d 69 (1986) (prima facie case of equal protection violation established by exclusion of the four qualified black jurors).

Any invitation to racial prejudice in the criminal process is clearly prohibited by the fourteenth amendment. *Rose v. Mitchell*, 443 U.S. 545, 555–56, 99 S.Ct. 2993, 2999–3000, 61 L.Ed.2d 739 (1979).

> [A] prosecutor 'should not be permitted to summon that thirteenth juror, prejudice.' Racial prejudice can violently affect a juror's impartiality and must be removed from the courtroom proceeding to the fullest extent possible....

Thus, the purpose and spirit of the fourteenth amendment requires that prosecutions in state courts be free of racially prejudiced slurs in argument. The standard for state prosecution in this regard is thus as high as the rigorous standard required of the federal courts

---

defendant and was fully admissible at sentencing. *Zant*, 462 U.S. at 886, 103 S.Ct. at 2747; *see also id.* at 890, 103 S.Ct. at 2749 (suggesting different result with inadmissible evidence).

**21.** This claim was not raised before the state courts. In one sense, there has been no "deliberate" bypass of state remedies in favor of federal review because it was never brought to our attention either. There can be cause for the bypass of state proceedings, however, in the ineffective assistance of state counsel to raise this claim. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). While not every failure to recognize the factual or legal basis of a claim is ineffective assistance,

I believe that the failure to raise this impropriety is ineffective assistance because of the obviousness of the appeal made by the prosecutor and the explosiveness of the prosecutor's argument. I find both cause and prejudice for the default. To the extent that the majority believes that the performance of state counsel is not before us because Blair's current attorney has not raised it, a successive habeas petition is available to challenge the decisions of Blair's current attorney. *See supra* note 3.

**22.** *See Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987); *Allen v. Hardy*, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986).

**1352**

by the fifth amendment's due process clause.

*United States v. McKendrick*, 481 F.2d 152, 157–59 (2d Cir.1973) (quoting *United States v. Antonelli Fireworks*, 155 F.2d 631, 659 (2d Cir.1946) (Frank, J., dissenting), *cert denied*, 329 U.S. 742, 67 S.Ct. 49, 91 L.Ed. 640 (1946)). "Even if brief, use of race as a factor in a closing argument obviously would be improper ..." *Brooks v. Kemp*, 762 F.2d 1383, 1413 (11th Cir. 1985) (en banc), *cert. granted and judgment vacated*, 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), *on remand*, 809 F.2d 700 (11th Cir.) (en banc) (per curiam), *cert. denied*, 483 U.S. 1010, 107 S.Ct. 3240, 97 L.Ed.2d 744 (1987). A reversal of Blair's sentence is required if race played any part in his trial. *See Rose*, 443 U.S. at 556–59, 99 S.Ct. at 3000–02 (reversing the defendant's conviction because of discrimination in the selection of grand jury foreman despite the defendant's subsequent conviction by a separate jury).

### V.

In criminal cases, the government must wear two hats. The prosecutor must act as an advocate, although he or she is repeatedly cautioned to put ahead of partisan success observance of the law—not the law as it might be stretched in one direction, but the law as it is interpreted with considerations of justice and fairness. Courts must act as a neutral and sometimes unpopular check and balance against the weight of unrestrained prosecutorial partisanship. When neither do their job, justice and law are not left on speaking terms.

The failure to give a first-degree murder instruction and the inconsistent treatment of this issue by the Missouri Supreme Court require that Blair be given a new trial. Even if it were assumed that there was no instructional error, the concealment of the perjured testimony, together with the prosecution's deliberate elicitation of it to bolster Jones' credibility, require that

this matter be remanded to the district court to determine whether the concealment and perjury were harmless beyond a reasonable doubt. Finally, even if it were assumed that the perjury was not grounds for a remand, the prosecutor's appeals to social and racial prejudice justify a new sentencing hearing. For the reasons stated, I dissent.